129 Wis.2d 362 (1986)
384 N.W.2d 719
OBSTETRICAL & GYNECOLOGICAL ASSOCIATES OF NEENAH, S.C., Plaintiff-Respondent,
v.
Vivian LANDIG, Defendant and Third-Party Plaintiff-Appellant,
Fred J. BARTIZAL and Ronald L. Strebel, Third-Party Defendants.
No. 84-2183.
Court of Appeals of Wisconsin.
Oral argument November 19, 1985.
Decided February 12, 1986.
*363 For the defendant and third-party plaintiff-appellant, briefs were submitted by the Eisenberg & Kuehl, S.C. firm of Milwaukee. Oral argument by Steven R. Wiechmann.
For the plaintiff-respondent, a brief was filed by Jeffrey W. Hanes of Remley, Sensenbrenner, Stein, Cummings, Snyder & Hanes, S.C. of Neenah. Oral argument by Jeffrey W. Hanes.
For the Department of Justice, an amicus curiae brief was submitted by Bronson C. La Follette, attorney general, and Kevin J. O'Connor, assistant attorney general. Oral argument by Kevin J. O'Connor.
Before Scott, C.J., Brown, P.J., and Nettesheim, J.
BROWN, P.J.
This case concerns a species of Wisconsin's anti-trust law, sec. 133.05, Stats.secret rebates. At issue is statutory interpretation. The major question is: Did the legislature intend to outlaw all secret rebates on the basis that they are unreasonably anti-competitive per se? Or, did the legislature intend that secret rebates are unlawful only if complainants *364 prove competitive injury? The trial court found the former to be the case and granted summary judgment for the complainant. We reverse.
The basic facts are as follows: Obstetrical & Gynecological Associates of Neenah, S.C. (OB-GYN) was moving to a newly constructed building and hired Vivian Landig to do the interior decorating. In exchange for Landig's services, she was to receive fifteen percent of the total purchases made in decorating the premises. The agreement also specified that Landig obtain the best possible prices from suppliers.
Landig obtained discounts but did not inform OB-GYN. Instead, she quoted retail prices to OB-GYN. OB-GYN, believing the quoted prices to be the best price available, wrote checks in the amounts requested; Landig delivered the checks to the suppliers who, in turn, gave Landig rebates for the discounted sums. Landig did not pass these rebates on to OB-GYN.
When Ob-GYN discovered this practice, it refused to pay Landig's final bill and sued her under various theories. Among them was an allegation that subsets. 133.05(1) and (2), Stats., were violated. The trial court entered summary judgment on this ground, the effect of which was to allow for trebling of damages and payment of attorney fees pursuant to sec. 133.18(1), Stats. Landing appeals the summary judgment. A brief discusion of preliminary concepts is necessary before discussing sec. 133.05 with particularity.
The guiding principle of ch. 133, Stats., is free competition. See sec. 133.01, Stats. Although in truth every commercial agreement restrains competition, Grams v. Boss, 97 Wis.2d 332, 348, 294 N.W.2d 473, 481 (1980), to read anti-trust law as prohibiting all agreements restraining trade would stifle commerce. Hansen, Spotting *365 Unreasonable Restraints of Trade Without Difficulty, 55 Wis. Bar Bull., June 1982, at 22. For example, if Adams sells a car to Smith, the car cannot be sold to Jones. Id. Still, the transaction is for the greater good. Courts, therefore, have ruled that the commercial agreement must, in most cases, unreasonably restrain competition before they will vacate a free market transaction. See Grams at 348, 294 N.W.2d at 481.
It is expensive, however, to prove that a restraint is unreasonable. Hansen at 22. As stated by one commentator:
One must identify the market, show how the restraint adversely affects it, and prove that the benefits of the restraint do not justify the resulting encroachment on competition. Trials last weeks, months and sometimes years. And then there is discovery.
Economics, experience and common sense disclose that some practices nearly always restrain trade without compensating benefit.
Id. In recognition of this difficulty, courts and legislatures have fashioned what has been termed as per se treatment. This is defined by the United States Supreme Court as follows:
[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5 (1958).
The Wisconsin legislature apparently has enacted anti-trust laws containing a per se rule. Section *366 100.201(2)(a)1., Stats., for example, seems to forbid certain rebates in the dairy industry without regard to proof of an adverse effect upon competitors or competition generally. Also, sec. 100.15, Stats., concerning trading stamps, and sec. 218.01(9), Stats., dealing with auto dealerships, appear to have undergone per se treatment. The question is whether the Wisconsin legislature has done it here. With this discussion of preliminary concepts in place, we move on to the interpretation of the statute.
Because interpretation of the statute is a question of law, we pay no deference to the trial court. Hainz v. Shopko Stores, Inc., 121 Wis.2d 168, 172, 359 N.W.2d 397, 400 (Ct. App. 1984). We interpret the statutes ab initio. Id.
Section 133.05(1), Stats., states:
The secret payment or allowance of rebates, refunds, commissions or unearned discounts, whether in the form of money or otherwise, or the secret extension to certain purchasers of special services or privileges not extended to all purchasers purchasing upon like terms and conditions, such payment, allowance or extension injuring or tending to injure a competitor or destroying or tending to destroy competition, is an unfair trade practice and is prohibited. [Emphasis added.]
OB-GYN interprets the statute to mean that competitive injury is "not a required element of the prohibited unfair trade practice but a legislative finding as to the consequences of secret rebates." It focuses upon that part of the statute emphasized above and asserts that we must read this as a legislative conclusion that all secret rebates have a pernicious effect upon competition. *367 OB-GYN claims that the legislature made this "finding" in light of its belief that proof of anti-competitive effect would be too costly and too difficult to meet.
There is nothing in the language of the statute explicitly stating that such is the legislature's will. Nor is there any authority cited by OB-GYN for this proposition. Yet, just because OB-GYN's interpretation is novel does not make it meritless. Upon its face, the statute is unclear as to whether per se treatment has been afforded. The statute can reasonably be interpreted either way. When two reasonable but conflicting interpretations can be given for the same statute, it can be fairly described as ambiguous. Wisconsin Bankers Association (Inc.) v. Mutual Savings & Loan Association, 96 Wis.2d 438, 450, 291 N.W.2d 869, 875 (1980). We thus turn to extrinsic aids to help us in our interpretive task. Hainz, 121 Wis.2d at 172, 359 N.W.2d at 400.
Probably the most beneficial of aids in this instance is legislative history. The disputed language has been part of this statute or its equivalent since at least 1935.
In 1976, a proposal was made to revise this statute by adopting language similar to sec. 2(d) of the federal Robinson-Patman Act which does not contain a competitive impact element. See 1975 Assembly Bill 1316 (introduced January 21, 1976 at the request of the Department of Justice). This proposal for a per se rule was, however, rejected. Subsequently, minor changes were made but none of the changes did away with the language relating to the effect upon a competitor or competition that we find in the present statute, sec. 133.05, *368 Stats. This history alone convinces us that the legislative process considered the language to create an element that must be proven.
Another valuable extrinsic aid is to compare the language of our statute with similar federal anti-trust statutes.
We are not obliged to follow federal precedent in the instant case. The Robinson-Patman Act is not controlling given the differences in language between it and sec. 133.05, Stats.
Nonetheless, it is significant that the language seized upon by OB-GYN as indicative of a per se rule is very similar to the language found in the general price discrimination section of the Robinson-Patman Act. See sec. 2(a), 15 U.S.C.A. § 13(a) (1973). That section reads in pertinent part:
It shall be unlawful... to discriminate in price... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them
. . . .
15 U.S.C.A. § 13(a) (1973) (emphasis added). Section 133.05, Stats., contains a slightly different formulation but not different enough that we should overlook federal treatment of that language as having created an element. See Texas Gulf Sulphur Co. v. J.R. Simplot Co., 418 F.2d 793 (9th Cir. 1969).
On the other hand, federal laws which are specific "rebate" statutes do have per se rules. See secs. 2(d) and *369 2(e), 15 U.S.C.A. §§ 13(d) and (e) (1973). Yet, these sections do not contain any "effect upon the competitor or competition" language. We conclude that had the legislature wanted a per se rule, it would have been a simple matter to excise the language regarding the effect upon the competitor or competition.
We are further unpersuaded by OB-GYN's argument that language in sec. 133.04, Stats. (the Wisconsin price discrimination statute), clearly provides for a competitive injury element and had the legislature been so inclined, it could have instituted the same language for sec. 133.05, Stats.
Section 133.04, Stats., requires that the price discrimination must be "for the purpose or intent of injuring or destroying competition." OB-GYN concludes that the words "purpose" and "intent" are explicit in this section but are not found in sec. 133.05, Stats.
We agree with the attorney general, acting as amicus curiae, however, that while intent to injure may be the focus of the price discrimination statute, sec. 133.05, Stats., has effect upon the competitor or competition as its focus. As pointed out earlier, effect on competition is an element found in 15 U.S.C.A. § 13(a) (1973). Itis also found in a statute regulating mergers. See sec. 7 Clayton Act, 15 U.S.C.A. § 18 (1973).
We conclude that to prevail under sec. 133.05, Stats., it is not necessary to show intent to injure, but it is necessary to prove that the secret rebate had an effect upon a competitor or an effect upon competition. Since this is a question of fact, summary judgment was inappropriate. We reverse and remand.
We must reach one other issue. Landig claims that OB-GYN lacks standing to sue under this statute, such *370 that the sec. 133.05, Stats., issue need not even be tried upon remand. Amicus joins this argument. Amicus argues that standing exists only if the plaintiff "was within the target area of the illegal practices" and "was not only hit but was aimed at." Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358, 365 (9th Cir. 1955). The federal courts have fashioned a test as follows:
The "target area" has been described as "that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry." "Aimed at" is intended to express the view that in order to have standing, "plaintiff's affected operation [must have been] actually in the area which it could reasonably be foreseen would be affected by the conspiracy."
The "target area" approach in theory offers a pragmatic and realistic alternative to resolve oftentimes difficult and troublesome questions raised by the rigid "direct-indirect" test of standing, for it attaches more importance to the nature of the particular antitrust violation and the area of competition defendant knew or should have known would be adversely affected.
16G Business Organizations, Von Kalinowski, Antitrust Laws and Trade Regulations § 101.02(2)(b) at XXX-XX-XXX-XX (1985) (footnotes omitted). Amicus asserts that since OB-GYN is not a competitor of either the seller or the recipient of the allegedly "secret rebate," OB-GYN cannot show direct injury "by reason of" the secret rebate under sec. 133.18(1), Stats.,[1] and therefore has no standing.
*371 Amicus opines, in fact, that it is difficult to discern from the record, in this case, any direct injury to a competitor or competition at any level, primary (supplier), secondary (buyer), or tertiary (ultimate consumer). It points to a federal court decision interpreting sec. 133.185, Stats. (1967), the predecessor to sec. 133.05, Stats., as possibly relating to only the primary level of competition. Chapiewsky v. G. Heileman Brewing Co., 297 F. Supp. 33 (W.D. Wis. 1968).[2]
We do not agree with amicus' analysis. The target area approach is a federal judicial creation designed to delineate the difference between one who is only incidentally injured by a violation of the anti-trust laws the bystander who was hit but not aimed atand one who was directly injured. Karseal Corp., 221 F.2d at 363. This is in recognition of the federal law that only persons directly injured "by reason of" intent to restrain competition can seek damages. See id.
There is no need to make the direct-indirect distinction under our statute. Section 133.18(1), Stats., explicitly allows any person injured directly or indirectly to sue upon this statute. Similar language is not found in the federal law. See 15 U.S.C.A. § 15 (1973). This, coupled with the legislature's instruction that we give *372 the most liberal construction to achieve the aim of competition, compels us to the conclusion that an ultimate consumer who pays a higher price for goods and services indirectly due to a secret rebate comes within the ambit of the statute. In addition to the clear wording of the statute, we perceive a valid policy reason for our holding. By encouraging ultimate consumers (tertiary level) to bring lawsuits for violation of this section, the perpetrators will evaluate risk differently. They may decide that it is not worth the risk because of the chance of having to pay treble damages under sec. 133.18(1). OB-GYN, we conclude, has standing.
We therefore remand this case to the trial court for a trial on the merits.[3]
By the Court.Judgment and order reversed and cause remanded.
NOTES
[1] Section 133.18(1), Stats., states:

Any person injured, directly or indirectly, by reason of anything prohibited by this chapter may sue therefor and shall recover threefold the damages sustained by the person and the cost of the suit, including reasonable attorney fees. Any recovery of treble damages shall, after trebling, be reduced by any payments actually recovered under s. 133.14 for the same injury.
[2] The attorney general claims that Chapiewsky is too narrow in scope and argues that injury to a competitor can occur not only at the primary level but also the secondary level (which in this case would be Landig).
[3] We asked the parties in preparing for oral argument to discuss Roux Laboratories, Inc. v. Beauty Franchises, Inc., 60 Wis.2d 427, 210 N.W.2d 441 (1973). We were concerned that language in Roux could be read to state that "per se" treatment should not be afforded in secret rebate cases. Both OB-GYN and amicus argued that the Roux case is not dispositive of the case before us. We agree. Even if it were dispositive, the result in this case is not inconsistent with Roux.