Sam DUNLAP, Ed Bachmann, Margge Adler, Janalyn Kehm and Lawrence D. Ochs, individually, and as representatives of all others similarly situated, Petitioners,

v.

COLORADO SPRINGS CABLEVISION, INC., a Colorado corporation; Leonard Tow, John Doe and Richard Doe, individually, Respondents.

No. 90SC386.

Supreme Court of Colorado,
En Banc.

April 13, 1992.

Rehearing Denied May 26, 1992.

Ireland, Stapleton, Pryor & Pascoe, P.C., Tucker K. Trautman, Denver, and James Robert Barash, Colorado Springs, for petitioners.

J. Gregory Walta, Colorado Springs, for all petitioners except Lawrence D. Ochs.

Holland & Hart, Gregory R. Piché, Joseph W. Halpern and William E. Mooz, Jr., Denver, for respondents.

Davis, Graham & Stubbs, David R. Hammond and Gary R. Doernhoefer, Denver, for amicus curiae Colorado Retail Council.

Justice LOHR delivered the Opinion of the Court.

This case presents the issue of whether consumers of cable television services can establish a claim for relief under Colorado's Unfair Practices Act based on allegedly unlawful pricing practices of the supplier in a geographical area different from that in which the plaintiff consumers receive their services. The district court dismissed a class action suit for damages brought by the plaintiff consumers against Colorado Springs Cablevision, Inc. alleging that in the only area in which Cablevision faced competition, it established prices that were discriminatory and below cost with the intent to destroy competition and injure subscribers, in violation of Colorado's Unfair Practices Act, §§ 6–2–101 to –117, 2 C.R.S. (1973 & 1991 Supp.). The Colorado Court of Appeals affirmed, holding that the plaintiffs failed to state a claim for relief. *Dunlap v. Colorado Springs Cablevision, Inc.*, 799 P.2d 416 (Colo.App.1990). We reverse and remand for further proceedings.

## I.

The individual plaintiffs are subscribers to the cable television service of Colorado Springs Cablevision, Inc. (Cablevision) in the City of Colorado Springs. Cablevision had no competition except in an area in the northern part of the city, in which Colorado Springs Citizens Cable, Inc. (Citizens Cable) also provided services.[1] We refer to the area served by both providers as the "Area of Competition" and to the other area served by Cablevision as the "Area of Noncompetition." In January 1988, the individual plaintiffs, on behalf of themselves and all others similarly situated—alleged to consist of approximately 45,000 households—brought a class action against Cablevision, its president, Leonard Tow, and unknown persons designated John Doe and Richard Doe in the District Court for El Paso County.[2] The plaintiffs averred that since April 1, 1986, Cablevision consistently has charged higher prices to subscribers in the Area of Noncompetition than in the Area of Competition, and based on that preliminary averment asserted two claims for relief. The first, which is not before us on certiorari review, asserted that the system of pricing violated the Colorado Springs Municipal Code. The second purported to state a claim for treble damages under the Unfair Practices Act on the basis that Cablevision's pricing in the Area of Competition constituted a sale of cable television services below cost, discriminated between different geographical areas, or both, with the intent to destroy competition and injure subscribers. The plaintiffs alleged that as a result of the discriminatory pricing they have overpaid for the cable television service and will be forced to do so in the future as long as the discriminatory pricing continues. The plaintiffs contend therefore that they are entitled to treble damages and future treble damages under section 6–2–111(1), as well as interest and costs. The plaintiffs sought recovery against the individual defendants as well as Cablevision on the basis that they aided and assisted Cablevision in the alleged violations.

The defendants moved to dismiss under C.R.C.P. 12(b)(5) on the basis that the municipal ordinance on which the plaintiffs based their first claim does not provide a private right of action and that the plaintiffs lacked standing to pursue their Unfair Practices Act claim for two reasons. Cablevision asserted first that the Unfair Practices Act provides protection only to competitors, not to consumers, and second that an overcharge is not a legally cognizable injury under that statute. After argument, the district court granted the motion to dismiss as to both claims. The court held that the plaintiffs failed to state a claim upon which relief can be granted for the alleged ordinance violation. As to the Unfair Practices Act claim, the court held that the plaintiffs lacked standing to sue because the Act addresses only injury to competitors and "is not intended to protect consumers who complain they pay too much." As a result, the plaintiffs "have not sustained any injury to any legal right."[3]

On appeal, the Colorado Court of Appeals affirmed. *Dunlap*, 799 P.2d 416 (Colo.App.1990). As to the Unfair Practices Act claim, it stated that the basis of the district court's dismissal order was C.R.C.P. 12(b)(5), failure to state a claim on which relief can be granted.[4] The court held that the Unfair Practices Act is ad-

---

**1.** At the hearing on the motion to dismiss, the parties acknowledged that the State was bringing a concurrent suit to enjoin the alleged area price discrimination violation. The plaintiffs advised this court in their brief that the State's action was dismissed because Cablevision acquired Citizens Cable. Cablevision does not dispute this contention and concedes in its brief that the two businesses have indeed merged.

**2.** The action was dismissed by the trial court prior to a ruling on the issue of class certification. *See* C.R.C.P. 23.

**3.** The court also noted that in order to violate the Unfair Practices Act a defendant must operate from at least two locations, and Cablevision operates in a single location in Colorado Springs. That issue is not before us on certiorari review.

**4.** As previously noted, the district court in fact based its dismissal of the Unfair Practices Act claim on lack of standing.

dressed to price cutting that might injure or destroy competition and that the issue of overcharging is unrelated to the Act's intent. *Id.* at 417. According to the court of appeals, the fact that some cable subscribers are charged a higher rate for services is not an injury of the type the Act was designed to prevent. *Id.* The court also sustained dismissal of the first claim for relief, which was predicated on violation of a Colorado Springs municipal ordinance. We granted certiorari limited to the issue of whether the plaintiff consumers have standing to assert a claim under the Unfair Practices Act.

## II.

The right of the plaintiffs to seek relief under the Unfair Practices Act in this case has been analyzed in the district court as presenting an issue of standing and in the court of appeals as posing an issue of failure to state a claim upon which relief can be granted. Therefore, we must consider both the doctrine of standing and the rules concerning dismissal for failure to state a claim in order to resolve the issue presented for review. The central question under both analyses, for the purposes of this case, is whether the plaintiffs have alleged an injury that is cognizable under the Unfair Practices Act, §§ 6–2–101 to –117, 2 C.R.S. (1973 & 1991 Supp.).

### A. Standing

■■■ To determine whether a particular plaintiff has standing to bring suit, a court must ascertain "(1) whether the party seeking judicial relief has alleged an actual injury from the challenged action; and (2) whether the injury is to a legally protected or cognizable interest" based on constitutional, statutory, or other recognized sources. *O'Bryant v. Public Utilities*

*Comm'n,* 778 P.2d 648, 652 (Colo.1989); *see Colorado General Assembly v. Lamm,* 700 P.2d 508, 516 (Colo.1985); *Wimberly v. Ettenberg,* 194 Colo. 163, 168, 570 P.2d 535, 539 (1977). The determination of whether a particular plaintiff has standing to bring suit is therefore inextricably tied to the merits of the case. *Cloverleaf Kennel Club, Inc. v. Colorado Racing Comm'n,* 620 P.2d 1051, 1056 (Colo.1980); *Wimberly,* 194 Colo. at 168, 570 P.2d at 539. A plaintiff satisfies the injury in fact requirement by demonstrating that the activity complained of has caused or has threatened to cause injury to the plaintiff such that "a court [can] say with fair assurance that there is an actual controversy proper for judicial resolution." *O'Bryant,* 778 P.2d at 653; *accord Conrad v. City and County of Denver,* 656 P.2d 662, 668 (Colo.1983). In resolving whether the plaintiff has alleged an injury sufficient to confer standing, a court must accept as true the allegations set forth in the complaint and may weigh other evidence supportive of standing. *Lamm,* 700 P.2d at 516. Here, the plaintiffs have alleged that they have been overcharged for cable television service. It is fair to infer from the complaint that the plaintiffs claim that the proceeds of the overcharges have been used to subsidize the price discrimination resulting from the low rates charged by Cablevision in the Area of Competition.[5] We conclude that the allegation of overcharges is sufficient to meet the injury in fact requirement.

■■■ The plaintiffs must also demonstrate that the harm allegedly suffered arose from the infringement of a legally protected interest for which judicial relief is available. *O'Bryant,* 778 P.2d at 653; *State Bd. for Community Colleges v. Olson,* 687 P.2d 429, 435 (Colo.1984). To meet this requirement, the plaintiffs must show that the legislature, in enacting the

---

5. The complaint alleges that the overcharges have existed since the date the alleged discriminatory pricing began and will continue as long as the discriminatory pricing practices persist. Statements by the plaintiffs' counsel during the hearing on the motion to dismiss, as well as an affidavit of an accountant submitted by the plaintiffs in opposition to the motion to dismiss, buttress the inference that the plaintiffs allege

the overcharges were used to subsidize price cutting in the Area of Competition. Although the complaint asserts damages based on the difference between the low rate charged in the Area of Competition and the higher rate charged in the Area of Noncompetition, the plaintiffs conceded at argument that the subsidy may actually be lower than that amount.

Unfair Practices Act, intended to confer a legal right on persons such as the plaintiff cable television customers to bring suit to redress the type of harm they allege. *See O'Bryant,* 778 P.2d at 653. The question thus becomes whether the injury alleged by the plaintiffs is the type of injury that the Unfair Practices Act was enacted to prevent. This last issue is closely tied to the issue of whether the plaintiffs have stated a claim upon which relief can be granted pursuant to C.R.C.P. 12(b)(5)[6] and is the central issue of this controversy.

### B. Failure to State a Claim

The purpose of a motion to dismiss for failure to state a claim is to test the formal sufficiency of the statement of the claim for relief. 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356, at 294 (2d ed. 1990). A complaint should not be dismissed for failure to state a claim upon which relief can be granted if, after examining the complaint, "the allegations provide for relief on any possible theory." *Id.* § 1357 at 337. Here, the plaintiffs alleged in pertinent part:

8. Defendant has no competitor in the cable television business, except Colorado Springs Citizens Cable, Inc., ("Citizens Cable"), which presently provides competing cable television services in a portion of northern Colorado Springs.

9. Since approximately April 1, 1986, Cablevision has consistently charged higher prices to subscribers outside the area in which it competes with Citizens Cable than it has charged to subscribers inside the geographic area in which it competes with Citizens Cable.

....

15. Cablevision's system of pricing violates the Colorado Unfair Practices Act, CRS 6-2-101 *et seq.* because it constitutes a sale of cable television service

below cost and/or it discriminates between different portions of the City of Colorado Springs by furnishing service at a lower rate in one portion of the City than in others, with the intent to destroy competition and injure subscribers of cablevision service.

16. As a proximate result of Cablevision's locality price discrimination, the Plaintiffs and the class they represent have overpaid for the service they receive from Cablevision since approximately April 1, 1986 and will be forced to overpay in the future for so long as Cablevision's system of discriminatory pricing continues.

17. Pursuant to CRS 6-2-111(1), Plaintiffs and the class they represent are entitled to three times their actual damages.

A court may not consider matters outside the allegations in the complaint when ruling on a motion to dismiss for failure to state a claim.[7] *McDonald v. Lakewood Country Club,* 170 Colo. 355, 360, 461 P.2d 437, 440 (1969). If a complaint is challenged for failure to state a claim, and "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in [C.R.C.P. 56] ...." C.R.C.P. 12(b); *Alexander v. Morrison–Knudsen Co., Inc.,* 166 Colo. 118, 123, 444 P.2d 397, 399–400 (1968), *cert. denied,* 393 U.S. 1063, 89 S.Ct. 715, 21 L.Ed.2d 706 (1969). However, where matters outside the pleadings are submitted but not considered by the trial court, the court is not required to convert the Rule 12 motion into a motion for summary judgment. *Privette v. University of North Carolina,* 96 N.C.App. 124, 385 S.E.2d 185, 189 (1989); *see also* 5A Charles A. Wright & Arthur R. Miller, *Fed-*

---

**6.** *See Lamm,* 700 P.2d at 516 ("A decision that a plaintiff lacks standing because the claimed injury does not infringe any legally protected right of the plaintiff may be viewed as equivalent to a holding that the plaintiff has failed to state a claim upon which relief may be granted."); *accord Olson,* 687 P.2d at 429.

**7.** This standard is more narrow than the standard for reviewing the issue of whether a plaintiff has standing. In the latter situation, a court may consider information outside of the complaint if it is supportive of a finding that the plaintiff has standing. *Lamm,* 700 P.2d at 516.

*eral Practice & Procedure* § 1366, at 491–93 (2d ed.1990).

Here, in addition to the complaint, the plaintiffs submitted the affidavit of an accountant who opined that assuming that Cablevision is supplying essentially the same service in both the Area of Competition and the Area of Noncompetition from essentially a common source, "the consumers in the monopoly area are paying a subsidy to support Cablevision's fight in the area of competition," and that "[t]o the extent that individual consumers in the area of monopoly are paying that subsidy, they are suffering 'damages' on an ongoing basis." However, in ruling on Cablevision's 12(b)(5) motion, the trial court observed that it "must consider only matters stated within the four corners of the pleadings ...." Moreover, the trial court did not in any way suggest in its ruling that it was relying on the information submitted by the plaintiffs in their affidavit. The court therefore properly treated Cablevision's motion as a motion to dismiss for failure to state a claim rather than a motion for summary judgment.

■ Motions to dismiss under Rule 12(b)(5) are "viewed with disfavor and are rarely granted under our 'notice pleadings.'" *Davidson v. Dill*, 180 Colo. 123, 131, 503 P.2d 157, 162 (1972). "'[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Id.* at 131–32, 503 P.2d at 162 (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). In addition, the allegations of the complaint must be viewed in the light most favorable to the plaintiff. *Bell v. Arnold*, 175 Colo. 277, 281, 487 P.2d 545, 547 (1971).

The trial court ruled that the consumers had not alleged a legally cognizable injury under the Unfair Practices Act. We turn our attention therefore to determining whether the plaintiffs have alleged a sufficient injury to proceed with their suit against Cablevision.

### III.

In order to ascertain whether the plaintiffs have suffered an injury under the Unfair Practices Act, we must look to the provisions of that Act to determine what practices it seeks to prohibit. Two sections of the Unfair Practices Act are relevant to the dispute at hand; one section authorizes private enforcement of certain Unfair Practices Act violations and the other defines the prohibited act of discriminatory pricing.[8] *See* §§ 6–2–111(1) and 6–2–103, respectively. We must consider both provisions in assessing whether the plaintiffs in this case can bring suit against Cablevision. In resolving the issue before us, we must first determine generally whether consumers may bring private damage actions to enforce provisions of the Unfair Practices Act. We must then decide specifically whether the injuries allegedly suffered by the plaintiff consumers in this case are of the type contemplated by the price discrimination laws, with the result that they have incurred damages recoverable under the Unfair Practices Act.

### A. Enforcement Provision

Private enforcement of certain sections of the Unfair Practices Act, including the section that prohibits price discrimination, is authorized by section 6–2–111(1):

> Any person, firm, private corporation, municipal corporation, public corporation, or trade association may maintain an action to enjoin a continuance of any act in violation of sections 6–2–103 to 6–2–108 or section 6–2–110 and, if injured thereby, for the recovery of damages. If, in such action, the court finds that the defendant is violating or has violated any of the provisions of [the above stated

---

**8.** Although the plaintiffs alleged a violation of both the sales below cost provision of the Unfair Practices Act, § 6–2–105, and the provision prohibiting area price discrimination, § 6–2–103, they alleged damages resulting only from price discrimination. In addition, the price discrimi-

nation violation is the exclusive focus of the parties' briefs. Therefore, we limit our analysis to whether the plaintiffs may assert a claim for a violation of the provision prohibiting area price discrimination.

sections], it shall enjoin the defendant from a continuance of the violations. It shall not be necessary that actual damages to the plaintiff be alleged or proved. In addition to such injunctive relief, the plaintiff in said action shall be entitled to recover from the defendant three times the amount of the actual damages, if any, sustained.

In construing this provision we must adhere to established rules of statutory construction. "Our primary task in construing a statute is to determine and give effect to the intent of the General Assembly." *Kern v. Gebhardt*, 746 P.2d 1340, 1344 (Colo.1987); *accord Danielson v. Castle Meadows, Inc.*, 791 P.2d 1106, 1111 (Colo.1990); *Engelbrecht v. Hartford Accident & Indem. Co.*, 680 P.2d 231, 233 (Colo.1984). The construction adopted by the court should be the one "that best effectuates the purposes of the legislative scheme." *Smith v. Myron Stratton Home*, 676 P.2d 1196, 1199 (Colo.1984). To determine intent we initially consult the language of the statute, giving the statutory terms their plain and ordinary meaning. *Kern*, 746 P.2d at 1344; *Trinity Universal Ins. Co. v. Hall*, 690 P.2d 227, 230 (Colo.1984). Here, section 6–2–111(1) declares that *"any person"* may recover damages if that person is injured by a violation of certain sections of the Unfair Practices Act. The plain and ordinary meaning of the word "person" includes individual consumers. In addition, according to section 2–4–401(8), 1B C.R.S. (1980), unless the statutory context requires otherwise, the term " '[p]erson' means *individual,* corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership, or association, or any other legal entity." (Emphasis added.) There is nothing in the context of the statutory scheme to indicate that the term "person" as used in section 6–2–111(1) should be limited to exclude individual consumers from bringing suit under the statute.

Examination of the legislative declaration of purpose is also helpful in determining legislative intent if the operative language is ambiguous. *United States v. Wilkinson*, 686 P.2d 790, 792 (Colo.1984); *see* § 2–4–203(1)(g). The legislative declaration of the Unfair Practices Act states that the purpose of the Act

is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented. This article shall be liberally construed so that its beneficial purposes may be subserved.

§ 6–2–102. The Unfair Practices Act was thus enacted primarily to protect the public and encourage competition. Consistent with these purposes, section 6–2–111(1) should be construed to grant standing to individual consumers who can show that they have been injured by a violation of the Act, because such an interpretation permits comprehensive private enforcement of the Act. By encouraging consumer enforcement of the Unfair Practices Act, we induce potential violators to reevaluate the risk associated with transgressing the requirements of the statute. *See Obstetrical & Gynecological Assocs. v. Landig*, 129 Wis.2d 362, 384 N.W.2d 719, 724 (1986).

Section 6–2–111(1) has a federal counterpart in section 4(a) of the Clayton Act. 15 U.S.C. § 15(a) (1991 Supp.). In other contexts we have indicated that "federal and state antitrust statutes serve complementary purposes and, in view of their common goals of preserving free competition and protecting the public against illegal restraints of trade, the antitrust decisions of the United States Supreme Court are entitled to careful consideration in determining the meaning and scope of [Colorado antitrust statutes]." *People v. North Ave. Furniture & Appliance, Inc.*, 645 P.2d 1291, 1293 n. 3 (Colo.1982). We therefore find it significant that section 4(a) of the Clayton Act has been interpreted to permit consumer standing to bring suits for antitrust violations. The federal standing provision is similar, but not identical, to the Colorado provision. It states that

[e]xcept as provided in subsection (b) of this section [limiting recovery by a foreign state], any person who shall be injured in his business or property by

reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee....

Clayton Act § 4(a), 15 U.S.C. § 15(a) (1991 Supp.).

In determining what persons have standing to bring suit under this provision, it is first necessary to consider the nature of the injury that must be alleged. The United States Supreme Court has interpreted section 4(a) to require proof of more than just an injury causally linked to the antitrust violation. The Court has concluded that

> [p]laintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause."

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (quoting *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 125, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969)). In adopting the antitrust injury requirement, the Court concluded that in the absence of a clear statutory command, it was necessary to interpret the statute to require more than merely a loss causally linked to the presence of a violator in the

market because such an interpretation would "divorce[ ] antitrust recovery from the purposes of the antitrust laws." *Id.* 429 U.S. at 487, 97 S.Ct. at 696. We agree with the reasoning in *Brunswick* that absent clear language in the statute the injury alleged by a plaintiff bringing suit for a violation of the Unfair Practices Act must be of the type the statute was intended to prevent.[9]

Such an interpretation, however, does not prevent consumers from bringing suit to enforce the antitrust laws. As was pointed out by the Court in *Brunswick*, the legislative history of the federal treble damage provision indicates that the provision "was conceived of primarily as a remedy for '[t]he people of the United States as individuals,' especially consumers." *Brunswick*, 429 U.S. at 486 n. 10, 97 S.Ct. at 696 n. 10 (quoting 21 Cong.Rec. 1767–1768 (1890) (remarks of Sen. George)). In *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979), the Court specifically held that a consumer alleging a wrongful deprivation of her money as a result of illegal price fixing had been injured in her property within the meaning of section 4(a) of the Clayton Act.[10]

We therefore hold that if consumers can show that they have been injured as a result of an antitrust violation specified in section 6–2–111(1), and the injury is the type of injury that the particular antitrust statutory provision was designed to prevent, then consumers may maintain an action for damages under section 6–2–

---

9. At least one state court would permit recovery by consumer-plaintiffs on the basis of an indirect injury. However, this holding is based on the language of its statute authorizing private enforcement of antitrust violations that specifically permits "[a]ny person injured, directly or indirectly, by reason of anything prohibited by [the antitrust laws]" to bring suit. *Landig*, 384 N.W.2d at 723 n. 1 and 723–24.

10. In *Associated Gen. Contractors v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), the United States Supreme Court announced a series of factors to consider in determining whether a plaintiff has standing to sue under Section 4 of the Clayton Act. These factors are (1) a causal

connection between an antitrust violation and the harm to the plaintiff, (2) improper intent on the part of the defendant, (3) the nature of the plaintiff's alleged injury, (4) the directness or indirectness of the asserted injury, (5) the potential for duplicative recovery, and (6) the existence of a more direct victim of the violation. *Id.* at 537–45, 103 S.Ct. at 908–12. At the time *Associated General* was decided, the Court had already held that "[a] consumer whose money has been diminished by reason of an antitrust violation has been injured 'in his ... property' within the meaning of § 4 [of the Clayton Act]." *Reiter*, 442 U.S. at 339, 99 S.Ct. at 2331. Given the decision in *Reiter*, we consider it unnecessary to analyze the plaintiffs' status in terms of the factors set forth in *Associated General*.

111(1). This holding is in accord with a number of jurisdictions that have addressed the issue of consumer standing to sue for antitrust violations under similar statutes.[11] *See Ai v. Frank Huff Agency, Ltd.,* 61 Haw. 607, 607 P.2d 1304 (1980) (consumers may bring suit for violation of statute prohibiting unfair methods of competition and unfair or deceptive business practices); *Mason v. Mortgage America, Inc.,* 114 Wash.2d 842, 792 P.2d 142 (1990) (consumers who suffer injury can sue for violation of statute prohibiting unfair methods of competition and unfair or deceptive business acts if there is a causal link between such prohibited methods or acts and the injury suffered); *New Jersey Chiropractic Society v. Radiological Society,* 156 N.J.Super. 365, 383 A.2d 1182 (Ct.Ch. Div.1978) (consumers permitted to sue for violation of New Jersey Antitrust Act where they allege that defendants combined and conspired to monopolize trade in the delivery of health care services and consumers suffered injury in the form of increased costs for services); *Landig,* 384 N.W.2d 719 (customer of interior decorator permitted to bring suit for violation of statute prohibiting payment of secret rebates that injured or tended to injure competitors or destroyed or tended to destroy competition where decorator obtained secret rebates from supplier but did not pass savings on to customer).

In light of our holding that consumers may bring an action for damages under section 6–2–111(1) upon meeting certain requirements, we must analyze the particular violation alleged by the consumers in this case—area price discrimination under section 6–2–103—to determine whether the plaintiffs have alleged an injury of the type this particular provision was designed to prevent.[12]

**B. Price Discrimination Prohibition**

Section 6–2–103(1) declares it unlawful for any person, firm, or corporation doing business in the state of Colorado and engaged in the production, manufacture, distribution, or sale of any commodity, product, or service, . . . with the intent to destroy the competition of any regular established dealer in such commodity, product, or service, or to prevent the competition of any person, firm, private corporation, or municipal or other public corporation which in good faith intends and attempts to become a dealer, to discriminate between different sections, communities, or cities, or portions thereof, or between different locations in such sections, communities, cities, or portions thereof in this state by selling or furnishing a commodity, product, or service at a lower rate in one section, community, or city, or any portion thereof, or in one location in such section, community, or city, or any portion thereof than in another . . . .

In this action the plaintiff consumers allege that a violation of this section has occurred and that they have been damaged by the violation because they have been overcharged in order to subsidize and support Cablevision's attempt to drive its competitor out of business. Cablevision argues that this is not the type of injury that area price discrimination laws were designed to prevent and that the plaintiffs accordingly are not the proper persons to assert a claim under the statute.

Cablevision first contends that price discrimination legislation was designed primarily to protect competitors and that therefore only competitors may bring private enforcement actions for violations of these laws. Cablevision relies largely on the fact that the Robinson–Patman Act, the federal counterpart to § 6–2–103, was en-

---

**11.** Our research does not reveal any cases holding to the contrary. *But cf. Sivers Construction Co. v. United States Steel Corp.,* 272 Or. 608, 538 P.2d 932 (1975) (private damages action for violation of sales below cost prohibition not recognized, in circumstances where injuries complained of did not involve injuries to competitor and did "not in any way tend to destroy competition"). Enforcement provisions such as § 6–2–111 relate to a variety of antitrust provisions and therefore are construed in a variety of contexts. We have not conducted exhaustive research in every conceivable area.

**12.** *See* footnote 8 above.

acted primarily to protect competitors. *See generally*, Frederick M. Rowe, *Price Discrimination Under the Robinson–Patman Act* 3–23 (1962). The Robinson Patman Act declares it

unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where ... the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them [subject to certain exceptions and justifications] ....

Robinson–Patman Act § 2(a), 15 U.S.C. § 13(a) (1973).

Price discrimination is considered a destructive practice both because it may be utilized by a dominant business to create a monopoly and because it has been deemed to constitute unfair competition. Rudolf Callman, *The Law of Unfair Competition Trademarks & Monopolies* § 7.24 at 47 (4th ed. 1981) (hereinafter "Callman"). Price discrimination prohibitions contained in the precursor to section 2(a) of the Robinson–Patman Act, section 2 of the Clayton Act,[13] regarded price discrimination as primarily an antitrust violation because of its potential to drive competitors out of business and result in a monopoly. *Id.* at 48. "[A]ntitrust laws are designed to benefit consumers by encouraging low prices, not to protect competitors." *Indiana Grocery Co., Inc. v. Super Valu Stores, Inc.*, 684 F.Supp. 561, 582 (S.D.Ind.1988), *aff'd*, 864 F.2d 1409 (7th Cir.1989); *see also Bruns-*

*wick*, 429 U.S. at 488, 97 S.Ct. at 697 ("The antitrust laws ... were enacted for 'the protection of *competition*, not *competitors*,'" (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)) (emphasis originally in *Brown Shoe*); *North Ave. Furniture & Appliance*, 645 P.2d at 1295 (federal antitrust legislation is designed to protect the public by preserving free competition). As originally enacted, therefore, the federal statute focused on price discrimination as it affected the public and ultimate consumer rather than on how it affected competitors.

In 1936 the Clayton Act was amended by the Robinson–Patman Act, which added statutory provisions designed to protect competitors from unfair competition. The Robinson–Patman amendments complemented those Clayton Act provisions already in place that were designed to protect the market from the monopolistic effects of price discrimination. *See* Callman § 7.24 at 48. Therefore, the legislative history of the federal price discrimination provision indicates that the law was designed to protect the public generally from monopolistic actions as well as to protect competitors from unfair competition. The Colorado Unfair Practices Act was enacted in 1937 shortly after this federal legislation. Ch. 261, secs. 1–17, 1937 Colo.Sess.Laws 1280, 1280–87. The Colorado Act specifically provides that one of its purposes is to "safeguard the public against the creation or perpetuation of monopolies." § 6–2–102.

Cablevision also makes a closely related argument that the language of section 6–2–103(1) applies only to primary-line competition[14] and that because consumers are not

---

**13.** Section 2 of the Clayton Act provided

[t]hat it shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly to discriminate in price between different purchasers of commodities, which commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, where the effect of such

discrimination may be to substantially lessen competition or tend to create a monopoly in any line of commerce [subject to certain exceptions and justifications] ....

Clayton Act § 2, ch. 323, 38 Stat. 730 (1914).

**14.** "The line of competition between the seller ... and its competitors is called the 'primary line'; that between the buyer ... and his competitors, the 'secondary line.'" *Rose v. Vulcan Materials Co.*, 282 N.C. 643, 194 S.E.2d 521, 528 (1973); *see also Harris v. Capitol Records Dis-*

primary-line competitors they may not bring suit to enforce the statute. The specific language on which Cablevision focuses is that which prohibits discrimination intended to destroy the

> competition of any *regular established dealer* in such commodity, product, or service, or to prevent the competition of any person, firm, private corporation, or municipal or other public corporation which in good faith intends and attempts to become a *dealer*....

§ 6–2–103(1) (emphasis added). The language of the statute focuses on competition with other dealers. Such language has been held in other contexts to limit the reach of a price discrimination statute to primary-line competition. *Harris v. Capitol Records Distrib. Corp.*, 64 Cal.2d 454, 50 Cal.Rptr. 539, 543–44, 413 P.2d 139, 143–44 (1966) ("Unfair Practices Act 'protects only first-line competition against predatory price cutting on an area basis and does not make illegal price discriminations which only injure second or third-line competition ....' ") (quoting Birmingham, *Legal Aspects of Petroleum Marketing Under Federal and California Laws*, 7 U.C.L.A.L.Rev. 161, 246–47 (1960)); *Beam v. Monsanto Co., Inc.*, 259 Ark. 253, 532 S.W.2d 175, 181–82 (1976) (court rejects interpretation of state unfair practices act that would broaden the act to protect persons other than dealers).

We agree with Cablevision that the language of section 6–2–103(1) limits its scope to conduct intended to destroy or prevent primary-line competition. We do not believe, however, that it follows from this interpretation that the plaintiffs are not proper parties to bring the present suit. Although the plaintiffs in this action are not themselves "dealers," the injury they assert is a result of price discrimination allegedly intended to injure Cablevision's primary-line competitor, Citizens Cable. The facts, as alleged by the plaintiffs, present a classic case of price discrimina-

tion of the very type section 6–2–103(1) was designed to prohibit.

Cablevision's argument that the plaintiff consumers are not the proper parties to bring suit is similar to the argument raised by the defendants in *Blue Shield v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). In that case the plaintiffs were subscribers to a group health plan who challenged the plan's policy of reimbursing subscribers for the services of psychiatrists but not for the comparable services of psychologists as being violative of section 1 of the Sherman Act.[15] This section declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce ...." 15 U.S.C. § 1. The plaintiffs alleged that they were entitled to recover treble damages pursuant to section 4 of the Clayton Act because Blue Shield's failure to reimburse subscribers for the services of psychologists had been in furtherance of an unlawful conspiracy to exclude psychologists from a segment of the psychotherapy market. *Id.* at 470, 102 S.Ct. at 2543–44. The District Court had granted Blue Shield's motion to dismiss because the injury to the subscribers resulting from denial of reimbursement was not within "the 'sector of the economy *competitively* endangered' " and thus was " 'too indirect and remote to be considered "antitrust injury." ' " *Id.* at 470–71, 102 S.Ct. at 2544 (quoting District Court) (emphasis in original). The Fourth Circuit Court of Appeals reversed,[16] and the United States Supreme Court upheld the reversal. In determining that the plaintiffs' injury was not too remote, the Supreme Court looked

> (1) to the physical and economic nexus between the alleged violation and the harm to the plaintiff, and (2), more particularly, to the relationship of the injury alleged with those forms of injury about which Congress was likely to have been

---

*trib. Corp.*, 64 Cal.2d 454, 50 Cal.Rptr. 539, 543–44, 413 P.2d 139, 143 (1966).

**15.** 15 U.S.C. § 1 (1988).

**16.** *McCready v. Blue Shield*, 649 F.2d 228 (4th Cir.1981), *aff'd*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982).

concerned in making defendant's conduct unlawful ....

*Id.* at 478, 102 S.Ct. at 2547–48.

In this action, consumers in the Area of Noncompetition allege that Cablevision committed price discrimination with the intent to drive Citizens Cable out of business. They allege that they have been injured because the price they paid for Cablevision's service was artificially high in order to subsidize its price war against Citizens Cable inside the Area of Competition. It has been recognized that a competitor's ability to obtain funds from other customers to "subsidize" a price war is key to its ability to initiate and sustain the price war. "In some instances, [a competitor] can afford to finance his 'war effort' against his competitor *only* because he is able to subsidize the loss in that struggle with the profits from sales effected at higher prices in other markets." Callman § 7.01 at 4 (emphasis added); *see also Moore v. Mead's Fine Bread Co.*, 348 U.S. 115, 119, 75 S.Ct. 148, 150, 99 L.Ed. 145 (1954) (court recognized that ability of competitor to sustain price war was based in part on ability to underwrite losses through profits made by maintaining high prices in other markets). Because a competitor's act of subsidizing a price war through overcharges in other markets is so intimately tied to the unfair practice that section 6–2–103 seeks to prevent, we conclude that the payment of such overcharges is a type of injury that the statute was designed to prevent. *See Blue Shield*, 457 U.S. at 483–84, 102 S.Ct. at 2551 ("Although [plaintiff] was not a competitor of the conspirators, the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market."). We therefore hold that the plaintiffs in this action have alleged an injury that is cognizable under sections 6–

2–103(1) and –111(1) of the Colorado Unfair Practices Act.

We reverse the district court's dismissal of the plaintiffs' Unfair Practices Act claim and remand to the court of appeals to consider the issue of whether as a matter of law Cablevision is insulated from claims asserted under the Act because it has only one office,[17] and for further proceedings consistent with the views expressed in this opinion.

VOLLACK, J., dissents, and ROVIRA, C.J., and KIRSHBAUM, J., join in the dissent.

Justice VOLLACK dissenting:

The majority holds that consumers of Colorado Springs Cablevision, Inc. (Cablevision), have standing to bring an action for damages under the Unfair Practices Act (the Act), §§ 6–2–101 to –117, 2 C.R.S. (1973 & 1991 Supp.). The majority bases its holding on the premise that consumers may suffer injuries that the Unfair Practices Act is designed to prevent. I disagree. The Unfair Practices Act proscribes sales below cost and discriminatory sales when done with the intent to injure or destroy *competitors.*[1] §§ 6–2–103(1), 6–2–105(1), 2 C.R.S. (1973). As such, *consumers* can never be appropriate parties to bring suits under the Unfair Practices Act.

I.

From 1966 through 1985, Cablevision exclusively provided cable television service in Colorado Springs. In the fall of 1985, Cablevision charged approximately $25 a month for cable services. At that time, Colorado Springs Citizens Cable, Inc. (Citizens Cable), began to offer cable services in a portion of northern Colorado Springs. Cablevision in turn reduced its monthly fee by $10 in the same portion of Colorado Springs serviced by Citizens Cable.

**17.** As noted in footnote 3, an alternate basis for the trial court's ruling in this case was its conclusion that a defendant must operate from more than one location before a violation of § 6–2–103 can be established. It is unclear from the court of appeals' opinion whether the court considered this question, and we did not include it within the scope of our grant of certiorari review. It is therefore necessary to remand for further proceedings on the issue.

**1.** The Act also proscribes secret rebates or refunds when extended to injure competitors. § 6–2–108, 2 C.R.S. (1973).

On January 13, 1988, five consumers commenced an action for damages against Cablevision, contending that Cablevision's bifurcated rate system violated the Unfair Practices Act. None of the five consumers lived in northern Colorado Springs. The consumers contended that they were forced to overpay for a service. The consumers did not contend, however, that Cablevision increased their rates when dropping rates in northern Colorado Springs.

The district court ruled that the consumers did not have standing to sue Cablevision because the Unfair Practices Act did not contemplate their injury. The district court found, conversely, that the Unfair Practices Act forbids discriminatory and below-cost pricing, and only applies to primary competitors. The district court concluded that the Act is not intended "to protect consumers who complain they pay too much."

The consumers appealed. The court of appeals agreed with the district court's finding that the consumers complained of an injury that the Unfair Practices Act was not designed to prevent. We granted certiorari solely to determine whether the consumers have standing to sue Cablevision under the Unfair Practices Act. I find that they do not.

## II.

Analysis of standing to sue under a statute, as the majority notes, generally involves a two-part inquiry into whether a claimant has alleged an actual injury and whether that injury is to a legally protected or cognizable interest. Maj. op. at 1289 (citing *O'Bryant v. Public Utils. Comm'n,* 778 P.2d 648, 652 (Colo.1989); *Colorado Gen. Assembly v. Lamm,* 700 P.2d 508, 516

(Colo.1985); *Wimberly v. Ettenberg,* 194 Colo. 163, 168, 570 P.2d 535, 539 (1977)). The second part of the standing inquiry, which is not met in this case, is satisfied when a claimant demonstrates that the injury alleged is of the type that the statute was enacted to prevent. Maj. op. at 1290; *see Wimberly,* 194 Colo. at 168, 570 P.2d at 538; *see also Romer v. Colorado Gen. Assembly,* 810 P.2d 215, 218 (Colo.1991) ("The requirement that the injury be to a legally protected interest 'is grounded on prudential considerations of judicial self-restraint.' "). Thus, under Colorado law, the second part of standing analysis requires resort to statutory construction to determine whether the statute in question protects against the alleged injury.[2] A careful review of the Unfair Practices Act demonstrates that it was not enacted to protect consumers. The Act limits its protection to competitors.

### A.

When construing statutes, our primary task is to give effect to the intent of the General Assembly. *Farmer's Group, Inc. v. Williams,* 805 P.2d 419 (Colo.1991). When interpreting comprehensive legislative schemes, we must give meaning to all portions thereof and construe statutory provisions to further legislative intent. *A.B. Hirschfeld Press, Inc. v. City and County of Denver,* 806 P.2d 917 (Colo. 1991). We so construe statutes in order "to give consistent, harmonious and sensible effect to all [their] parts," and to avoid absurd constructions. *Walgreen v. Charnes,* 819 P.2d 1039, 1043 (Colo.1991); *see City of Ouray v. Olin,* 761 P.2d 784 (Colo.1988).

**2.** Standing analysis under federal law, with respect to claims brought pursuant to the federal antitrust act, the Clayton Act, is far more complex. The United States Supreme Court has distinguished between constitutional standing and "antitrust standing". *Southaven Land Co. v. Malone & Hyde, Inc.,* 715 F.2d 1079, 1084–85 (6th Cir.1983) (citing *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)). The Supreme Court found that generally harm to antitrust plaintiffs satis-

fies the constitutional requirement of actual injury. *Id.* Federal courts must, however, "make a *further* determination whether the plaintiff is a proper party to bring a private antitrust action." *Id.*

Accordingly, the Supreme Court enumerated a five-factor test for federal courts to use when analyzing standing. *Id.* Among the factors that federal courts must consider is whether a *more direct* victim of the alleged antitrust violation exists. *Id.*

The majority looks only to the language in section 6–2–111(1) to conclude that "nothing in the context of the statutory scheme ... indicate[s] that the term 'person' as used in section 6–2–111(1) should be limited to exclude individual consumers from bringing suit under the statute." Maj. op. at 1292. Section 6–2–111(1) states that "[a]ny person, firm, private corporation, municipal corporation, public corporation, or trade association may maintain an action to enjoin a continuance of any act in violation of sections 6–2–103 to 6–2–108 or 6–2–110."

In so stating, the majority only focuses on one word and fails to consider the remaining provisions of the section, as modified by the Act in which it is located. The comprehensive statutory scheme, however, must be considered. When evaluated in its entirety, the Unfair Practices Act only authorizes suits brought by competitors.

### B.

The Unfair Practices Act was first enacted in 1937. Act approved May 6, 1937, ch. 261, sec. 10, 1937 Colo.Sess.Laws 1280–87. From 1937 through 1969, the Act proscribed sales below cost and price discrimination when done with the intent to destroy competition or injure competitors. *See* §§ 55–2–1 to –3, 2 C.R.S. (1963); §§ 55–2–1 to –3, 2 C.R.S. (1953). Since its first version, the Act has authorized suits brought by "any person" to enforce its provisions. Ch. 261, sec. 10, 1937 Colo.Sess.Laws 1285. The Act has never expressly protected consumers from sales below cost or price discrimination. *See* §§ 6–2–101 to –117, 2 C.R.S. (1973 & 1991 Supp.); §§ 55–2–1 to –3, 2 C.R.S. (1963); §§ 55–2–1 to –3, 2 C.R.S. (1953).

Similar legislation to the Colorado Unfair Practices Act, including its deceptively sweeping authorization to bring suit, was simultaneously adopted in a majority of states. Homer Clark, *Statutory Restric-tions on Selling Below Cost,* 11 Vand. L.Rev. 105 (1957). At least one commentator has offered insight into the broad nature of these provisions:

> A minor but illuminating feature of the sales below cost statutes is the provision that *any person* may sue to enjoin a violation. This makes every citizen a prosecutor, to the extent that he is willing to spend money on litigation. It was probably intended to make it possible for trade organizations to police the statute. It has led to some strange judicial decisions, such as the holding that a plaintiff may enjoin a breach of the statute even though he himself has been selling goods below cost.... In other words enforcement by private lawsuits is totally inappropriate and ineffective.

*Id.* at 125–26 (citations omitted).

The Colorado Unfair Practices Act currently prohibits two distinct activities: discriminatory sales and sales below cost. §§ 6–2–103, 6–2–105, 2 C.R.S. (1973). The two distinct activities are proscribed only insofar as they are done with the intent to destroy competition or injure competitors. §§ 6–2–103(1), 6–2–105(1), 2 C.R.S. (1973).

These proscriptions apply to "any person, partnership, firm, corporation, joint stock company, or other association engaged in business in this state." § 6–2–105(1). The word "person" is followed by a list of terms that describe entities engaged in business.[3] No reference is made to consumers or customers of such business entities. "Any person" thus means "any person ... engaged in business in this state."[4] § 6–2–105(1).

The Act gives both discretionary and mandatory enforcement authority to the Colorado Attorney General. § 6–2–111, 2 C.R.S. (1973). If the attorney general receives a statement setting forth facts sufficient to constitute a prima facie violation of any proscription in the Act, the attorney

---

**3.** Section 6–2–103(1) similarly applies to "any person, firm, or corporation doing business in the state of Colorado and engaged in the production, manufacture, distribution, or sale of any commodity, product, or service, or output of a service trade."

**4.** Under § 6–2–103(1), "any person" also means "any person ... doing business in the state of Colorado."

general must seek injunctive relief. § 6–2–111(3), 2 C.R.S. (1973).

Placing section 6–2–111(1) in the context of the entire Act, I am compelled to conclude, as the majority concedes, that the language of section 6–2–111(1) is confined to primary-line competition.[5] Maj. op. at 1296. This conclusion compels the interpretation that only *competitors* can bring actions under the Unfair Practices Act. The majority's construction gives the language "any person" an absurd construction insofar as the proscriptions are clearly limited to entities engaged in business. §§ 6–2–103(1), 6–2–105(1), 2 C.R.S. (1973). The General Assembly clearly intended for "any person" to be construed as any person in the posture of a competitor when it borrowed the standard drafting terminology used by other states enacting similar legislation during the Depression.

### III.

The majority finds "it significant that section 4(a) of the Clayton Act has been interpreted to permit consumer standing to bring suits for antitrust violations." Maj. op. at 1292. Section 4(a) of the Clayton Act provides that "any person who shall be injured in his business or property by reason of *anything forbidden in the antitrust laws* may sue therefor." § 4(a), 15 U.S.C. § 15(a) (1991 Supp.). Any similarity between this provision and section 6–2–111(1) is illusory. Unlike section 6–2–111(1), section 4(a) of the Clayton Act addresses *all* federal antitrust violations, not just two distinct kinds of anticompetitive

behavior. The federal test for standing that accompanies this statutory provision is far more complicated than the two-part inquiry applied under section 6–2–111(1).[6] Not only do federal courts follow a five-factor test, federal standing analysis also differs depending on the remedy sought.[7] *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 111 n. 6, 107 S.Ct. 484, 490 n. 6, 93 L.Ed.2d 427 (1986).

I do not dispute that direct purchasers may be entitled to bring actions under federal antitrust laws. *See California v. ARC America Corp.,* 490 U.S. 93, 103, 109 S.Ct. 1661, 1666, 104 L.Ed.2d 86 (1988) (holding that direct purchasers can recover for *monopoly overcharges* under the Clayton Act). Federal antitrust laws do not, however, preempt state laws in this area. *Id.* at 102, 109 S.Ct. at 1665. The Supreme Court has recognized that it would be inappropriate for congressional policies to define "what federal law allows States to do under their own antitrust law." *Id.* at 103, 109 S.Ct. at 1666. This court is thus free to construe Colorado's prohibitions on sales below cost and discriminatory sales in accordance with the intent of the Colorado General Assembly.

### IV.

The majority construes the language "any person" to mean literally that any person can bring an action under the Unfair Practices Act. The Act, taken as a whole, does not yield to this construction. Accordingly, I find that the consumers do

---

**5.** At least one other court has held that private persons cannot bring suit under a similar statutory scheme. *Sivers Constr. Co. v. United States Steel Corp.,* 272 Or. 608, 538 P.2d 932, 934 (1975).

**6.** *See supra* note 2. The federal test involves analysis of the following five factors: (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5)

the existence of more direct victims of the alleged antitrust violation. *Associated Gen. Contractors v. California State Council of Carpenters,* 459 U.S. 519, 537–45, 103 S.Ct. 897, 908–12, 74 L.Ed.2d 723 (1983).

**7.** Federal standing analysis is directed by whether the antitrust plaintiff seeks treble damages or injunctive relief. Actions for treble damages present additional concerns, such as the potential for multiple lawsuits and double recovery, the difficulty of apportioning damages, and the existence of other parties sustaining more direct harm as a result of the anticompetitive behavior. *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 111 n. 6, 107 S.Ct. 484, 490 n. 6, 93 L.Ed.2d 427 (1986).

not have standing under the Act and therefore I dissent.

I am authorized to say that Chief Justice ROVIRA and Justice KIRSHBAUM join in this dissent.