Mary L. HENDERSON, Petitioner,

v.

Frank GUNTHER, former Director of the Colorado State Department of Corrections, in his individual capacity; William Price, Superintendent of The Arkansas Valley Correctional Facility, State Department of Corrections, in his individual capacity; and Ron Wager in his individual capacity, Respondents.

No. 95SC543.

Supreme Court of Colorado,
En Banc.

Jan. 13, 1997.

McDivitt Law Firm, P.C. Michael W. McDivitt, Colorado Springs, for Petitioner.

Gale A. Norton, Attorney General, Stephen ErkenBrack, Chief Deputy Attorney General, Richard Westfall, Solicitor General, Garth C. Lucero, Deputy Attorney General, Timothy R. Arnold, Deputy Attorney General, Gregg E. Kay, First Assistant Attorney General, Jack M. Wesoky, Senior Assistant Attorney General, Civil Litigation Section, Tort Litigation, Denver, for Respondents.

Justice KOURLIS delivered the Opinion of the Court.

We granted certiorari to review the court of appeals decision in *Henderson v. Romer*, 910 P.2d 48 (Colo.App.1995), affirming the trial court's order dismissing Petitioner Mary L. Henderson's 42 U.S.C. § 1983 (1994) claims against Frank Gunther, William Price, and Captain Ron Wager. We conclude that Henderson has failed to state a cognizable § 1983 claim. Therefore, we affirm the court of appeals.

## I.

Because the case was resolved on a motion to dismiss, we must view the allegations in Henderson's amended complaint in the light most favorable to her case. *Dunlap v. Colorado Springs Cablevision*, 829 P.2d 1286, 1291 (Colo.1992). In 1992, Henderson was employed as a housing technician at the Arkansas Valley Correctional Facility (the Facility) in Crowley County, Colorado. Pursuant to official policy, inmates were allowed to visit Henderson's office from 6:20 to 6:30 a.m. each morning to obtain aspirin and other personal items. Henderson was alone in her office during these visits and was prohibited from carrying a weapon.

On February 28, 1992, at approximately 6:30 a.m., William Sojka, an inmate, attacked Henderson in her office. Sojka took Henderson hostage with the broken shank of a mirror and locked her in an office. For approximately five and a half hours, Sojka beat Henderson, cut her on the neck, face and hands, and used an electrical cord to shock her repeatedly.

Wager, Henderson's supervisor at the Facility, and Price, superintendent of the Facility, informed the media of the hostage situation before notifying Henderson's family members. Henderson's husband, Randy Henderson, and her three children learned of the situation from news reports.

On May 21, 1993, Henderson, Randy, and the children (collectively, the Plaintiffs) filed a complaint against Roy Romer, governor of the State of Colorado, individually and in his official capacity; Aristedes Zavaras, director of the Colorado Department of Corrections, in his official capacity; Price, individually and in his official capacity; Wager, individually and in his official capacity; the State of Colorado; and the Department of Corrections (collectively, the Original Defendants).

In the complaint, Henderson alleged she was attacked and taken hostage as part of a concerted escape attempt by inmates at the Facility. Henderson further alleged that she had provided Wager with evidence of the planned escape at least a week before the attack, and that in compliance with official policy, she had filed a confirmatory memorandum. That memorandum was allegedly forwarded to Wager and Price.[1] Henderson also alleged that Wager and Price knew that Sojka had a P–5 psychological rating,[2] and therefore presented an unreasonable danger for the Facility and the housing unit in which Henderson worked.

Henderson further alleged that approximately four days prior to the attack, upon inquiry, Wager told her he had taken no action in response to the report of the planned escape. Henderson also learned that the day prior to the attack, an employee at the Facility had reported to Wager that an inmate had warned that employee not to come to work the following day. Despite the warnings of an impending escape, the Original Defendants took no action and Henderson was required to perform her job on the day of the attack without any additional protection.

The original complaint stated five claims for relief. The first three claims were brought under state tort law on behalf of Randy and the children. The fourth and fifth claims, brought on behalf of Henderson and her family members, respectively, sought damages pursuant to § 1983 for the willful, wanton, and reckless deprivation, under color of state law, of constitutional rights. In response to a C.R.C.P. 12(b)(5) motion filed on behalf of the Original Defendants, the trial court dismissed the state tort law claims, but permitted Henderson and her family leave to amend the complaint to specify the elements they would rely upon to establish jurisdiction under § 1983.

On September 9, 1993, the Plaintiffs filed an amended complaint asserting three § 1983 claims against Romer, Gunther,[3] Price, and Wager individually (collectively, the Amended Complaint Defendants).[4] In the first claim, Henderson asserted that Romer, Gunther, and Price acted with reckless disregard and deliberate indifference as to the effect their budgetary decisions and allocations of resources would have on Henderson's physical safety. In addition, Henderson alleged in the first claim that through their actions and omissions under the color of law,[5] the Amended Complaint

1. The Plaintiffs' amended complaint alleged that Gunther, director of the Colorado Department of Corrections, was also aware of the contents of the memorandum prior to the attack.

2. Neither the complaint nor the amended complaint specify the import of the P–5 psychological rating.

3. The amended complaint substituted Gunther for Zavaras as director of the Colorado State Department of Corrections.

4. The Plaintiffs also submitted a certification stating that they were not waiving the right to appeal the trial court's dismissal of the state tort law claims in the original complaint.

5. Specifically, the amended complaint alleged that the Amended Complaint Defendants:
 (a) failed to provide adequate security personnel, equipment, and systems to operate the facility in a way that was not unreasonably dangerous[;]
 (b) failed to maintain the facility adequately for its intended use[;]
 (c) failed to provide sufficient support for [Henderson] to defend herself[;]
 (d) improperly furnished the facility with fixtures and materials which were unreasonably subject to being converted to weapons by [Soj-

Defendants deprived Henderson of her constitutional right to be free from injury and her right not to be placed in a situation of known danger through their wilful, wanton, reckless, intentional, and deliberately indifferent behavior.

In the second claim, Randy and the children alleged that the Amended Complaint Defendants' actions and omissions deprived them of their constitutional right to be free from injury by subjecting them to the physical and emotional trauma resulting from an attack upon their wife and mother, respectively. In the third claim, Randy and the children asserted that Gunther and Price deprived them of their constitutional right to be free from injury by informing the news media that Henderson was being held hostage before informing them.

The Amended Complaint Defendants filed a motion to dismiss for failure to state a claim pursuant to C.R.C.P. 12(b)(5). The trial court granted the motion, holding that there was no "allegation that [Henderson] was held in the correctional facility against her will, was subjected to involuntary servitude, was denied due process, or deprived of any other constitutional right when her supervisor failed to act to protect her after being informed of the danger." The Plaintiffs appealed both the trial court order dismissing the original complaint and the order dismissing the amended complaint.[6] The court of appeals affirmed both orders in *Henderson*, 910 P.2d at 55.

After the Plaintiffs' petition for rehearing was denied, Henderson alone petitioned this court for certiorari asking that we review the court of appeals decision only with respect to her § 1983 claim against Gunther, Price, and Wager (collectively, the Facility Defendants) in their individual capacities.[7] We granted certiorari to decide the following issue: "Whether the court of appeals erroneously affirmed the trial court's dismissal of Henderson's claims pursuant to 42 U.S.C. § 1983, for injuries and damages arising from a denial of substantive due process."

## II.

Because Congress was concerned that state officials were depriving citizens of their federal constitutional rights, it enacted § 1 of the Civil Rights Act of 1871, currently codified at 42 U.S.C. § 1983 (1994). Section 1983 is an enforcement mechanism for the provisions of the Fourteenth Amendment to the Constitution. *Ngiraingas v. Sanchez*, 495 U.S. 182, 187, 110 S.Ct. 1737, 1740–41, 109 L.Ed.2d 163 (1990). Section 1983 provides in relevant part: "Every person who, [under color of law], subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured. . . ." 42 U.S.C. § 1983 (1994).

Hence, in order to prevail under § 1983, a plaintiff must show that the defendants, under color of state law, deprived the plaintiff of a right secured by the Constitution and laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981), *overruled on other*

ka] and ultimately used by [Sojka] as instruments to perpetrate the attack, beating, and torture of [Henderson] and her being taken and held hostage[;]

(e) allowed in the facility the housing of inmates unreasonably dangerous for the nature and resources of the facility[;]

(f) intentionally placed [Henderson] in a situation of danger created by them with reckless indifference, in unguarded proximity with an inmate unreasonably dangerous for the facility[;]

(g) . . . intentionally or recklessly failed to take any action in response to multiple warnings of the impending action by inmates to protect [Henderson] [;]

(h) . . . intentionally placed [Henderson] in a situation of known danger of their creation, with deliberate indifference to that danger, after receiving warning of a pending incident.

6. The trial court order also dismissed the Plaintiffs' claim that defendants Romer, Gunther, and Price violated the Plaintiffs' constitutional rights by making negligent budgetary decisions. Henderson's briefs do not address this aspect of the trial court order and this issue is not before us on appeal.

7. Thus, the second and third claims in the amended complaint are not before us on this appeal. Accordingly, we are not asked to consider whether Price and Wager violated any constitutional rights by informing the media of the hostage situation before informing Randy and the children.

*grounds, Daniels v. Williams,* 474 U.S. 327, 330–31, 106 S.Ct. 662, 664–65, 88 L.Ed.2d 662 (1986). In this case, Henderson claims that the Facility Defendants violated her rights to substantive due process under the Fifth and Fourteenth Amendments [8] by failing to protect her from Sojka's attack.

■ The constitutional guarantee of due process does not convert all common law duties owed by government actors into constitutional torts. *See Daniels,* 474 U.S. at 335, 106 S.Ct. at 667. Rather, this guarantee has been applied only to *"deliberate* decisions of government officials to deprive a person of life, liberty or property." *Id.* at 331, 106 S.Ct. at 665 (alteration in original).

■ Thus, the governing principle by which we must evaluate § 1983 claims is that the Due Process Clause is designed to prevent arbitrary exercise or abuse of *government* power. *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 196, 109 S.Ct. 998, 1003–04, 103 L.Ed.2d 249 (1989); *Collins v. City of Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 1068–69, 117 L.Ed.2d 261 (1992).

■ Nothing in the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private citizens. *DeShaney,* 489 U.S. at 195, 109 S.Ct. at 1002–03. Rather, the purpose of the Due Process Clause is "to protect the people from the State, not to ensure that the State protect[s] them from each other." *Id.* at 196, 109 S.Ct. at 1003. Thus, the general rule is that state actors are liable under the Due Process Clause only for their own acts and not for the violent acts of third parties. *Id.* at 197, 109 S.Ct. at 1004; *Uhlrig v. Harder,* 64 F.3d 567, 572 (10th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 924, 133 L.Ed.2d 853 (1996).

■ However, in certain limited circumstances the State has been found to have an affirmative duty to protect citizens from constitutional injury inflicted by a private person. Those circumstances have been framed as two exceptions to the general rule: (1) the special relationship exception; and (2) the danger creation exception.[9] The special relationship exception arises where the State has taken an individual into custody and holds him there against his will. *DeShaney,* 489 U.S. at 200, 109 S.Ct. at 1005–06.[10] Such a relationship between the State and the individual imposes upon the State a different duty than would otherwise be applicable. The genesis for the special relationship analysis lies in the jurisprudence of tort law in which special relationships such as between a common carrier and a passenger; an innkeeper and a guest; a parent and a child; and a hospital and a patient have been found to impose a duty of care. *See* Restatement

---

**8.** The Due Process Clause of the Fourteenth Amendment provides: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Fifth Amendment provides the same protection against actions by the federal government. Because Henderson's complaint is against employees of the State of Colorado, the Fourteenth Amendment is the applicable provision. Henderson's amended complaint alleges the deprivation of the right to be free from injury and the right not to be placed in a situation of known danger. The Supreme Court has held that the Fourteenth Amendment protects a liberty interest in physical security, *see Youngberg v. Romeo,* 457 U.S. 307, 315, 102 S.Ct. 2452, 2457–58, 73 L.Ed.2d 28 (1982), and we understand Henderson's amended complaint to allege the deprivation of this interest.

**9.** *See Liebson v. New Mexico Corrections Dep't,* 73 F.3d 274, 276 (10th Cir.1996); *Pinder v. Johnson,* 54 F.3d 1169, 1174–77 (4th Cir.), *cert. denied,* ——

U.S. ——, 116 S.Ct. 530, 133 L.Ed.2d 436 (1995); *Johnson v. Dallas Indep. Sch. Dist.,* 38 F.3d 198, 200–04 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1361, 131 L.Ed.2d 218 (1995); *Reed v. Gardner,* 986 F.2d 1122, 1124–25 (7th Cir.), *cert. denied,* 510 U.S. 947, 114 S.Ct. 389, 126 L.Ed.2d 337 (1993); *Gregory v. City of Rogers,* 974 F.2d 1006, 1010 (8th Cir.1992), *cert. denied,* 507 U.S. 913, 113 S.Ct. 1265, 122 L.Ed.2d 661 (1993); *L.W. v. Grubbs,* 974 F.2d 119, 121 (9th Cir.1992), *cert. denied,* 508 U.S. 951, 113 S.Ct. 2442, 124 L.Ed.2d 660 (1993); *Cornelius v. Town of Highland Lake,* 880 F.2d 348, 354 (11th Cir.1989), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990).

**10.** Only in a custodial setting has the United States Supreme Court found that inaction by governmental officials can give rise to liability. In all other settings, the Court has required some affirmative act that causes an injury before imposing liability. *DeShaney,* 489 U.S. at 199–200, 109 S.Ct. at 1005–06.

(Second) of Torts § 314A (1965).[11] If such a special relationship exists between the State and an individual, the State may have an affirmative duty to protect the individual from harm, and nonfeasance or inaction may give rise to liability. *DeShaney*, 489 U.S. at 199–200, 109 S.Ct. at 1005–06.

 Under the danger creation exception, the State may also be liable under § 1983 for failing to protect an individual from harm inflicted by a third party where the State has created the danger that ultimately causes the harm or the State has increased the individual's vulnerability to the harm. *See Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir.), *cert. denied*, 510 U.S. 947, 114 S.Ct. 389, 126 L.Ed.2d 337 (1993). Although the circuit courts differ in their views as to how large a role the State must play in creating a danger before a corresponding duty to protect arises, at the least, the State's involvement must be sufficient to satisfy the state action requirement of § 1983. *Uhlrig*, 64 F.3d at 572.

Since Sojka was a private party, the Facility Defendants, as state actors, would generally not be liable for his actions. Therefore, we must determine whether either exception to the general rule applies: specifically, whether Henderson's circumstances gave rise to a special relationship with the Facility Defendants, or whether the Facility Defendants' role in creating the danger culminating in Sojka's attack on Henderson gave rise to a corresponding constitutional duty to protect. As we venture into this area of the law, we are mindful of the Supreme Court's admonition that "guideposts for responsible decisionmaking in this uncharted area are scarce and open ended.... The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to

break new ground in this field." *Collins*, 503 U.S. at 125, 112 S.Ct. at 1068.

### A.

The only special relationship that has received the imprimatur of the Supreme Court is a custodial relationship. In *DeShaney*, the Supreme Court recognized the special relationship exception only in the narrow context of "incarceration, institutionalization, or other similar restraint of personal liberty," which leaves an individual without the ability to provide for basic needs.[12] *DeShaney*, 489 U.S. at 200, 109 S.Ct. at 1005–06.

 Henderson was not incarcerated or institutionalized. However, she argues that the special relationship exception should be extended to include situations in which a state actor limits an employee's ability to protect herself. In this case, Henderson claims that the Facility Defendants restrained her ability to protect herself by: (1) housing Sojka in her unit even though they knew he was too dangerous for the Facility; (2) assigning her to an unguarded office with insufficient barriers between herself and the inmates; (3) requiring her to be exposed to inmates while alone in her office at a set time daily; and (4) prohibiting her from carrying a weapon in her office.

Even if we were willing to extend special relationship analysis beyond custodial settings, where the relationship between the parties is one of consensual employment, a special relationship is extremely difficult to show. This is true, in part, because "state law, rather than the Federal Constitution, generally governs the substance of the employment relationship." *Collins*, 503 U.S. at 128, 112 S.Ct. at 1070.

In *Collins*, a decedent's wife brought an action under § 1983 alleging that the city

---

**11.** Section 1983 should be read against a backdrop of tort liability. *Monroe v. Pape*, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961), *overruled on other grounds, Monell v. Department of Social Servs.*, 436 U.S. 658, 663, 98 S.Ct. 2018, 2021–22, 56 L.Ed.2d 611 (1978).

**12.** This requirement is clear from the Supreme Court's opinion in *DeShaney* where the Court held:

[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*DeShaney*, 489 U.S. at 200, 109 S.Ct. at 1005–06 (citations omitted).

deprived the decedent, who was fatally injured in the course of his employment, of life and liberty by failing to provide a reasonably safe work environment. The Supreme Court distinguished prior cases in which it had found that the State owed a duty to take care of individuals who had already been deprived of their liberty, and held that the city had no such duty to the decedent because he voluntarily accepted employment. *Collins,* 503 U.S. at 127–28, 112 S.Ct. at 1069–70.

In circumstances similar to those in this case, the Tenth Circuit also declined to elevate consensual employment to a special relationship. *Uhlrig,* 64 F.3d at 572; *Liebson v. New Mexico Corrections Dep't,* 73 F.3d 274, 276 (10th Cir.1996). In *Uhlrig,* the plaintiff brought a § 1983 action after his wife was murdered by a patient in the state mental hospital in which she worked. The Tenth Circuit held that the special relationship exception was "inapplicable to the instant case because [the decedent] was simply an employee of the state ... and an employment relationship is consensual in nature." *Uhlrig,* 64 F.3d at 572.

In *Liebson,* the plaintiff, who was employed as a librarian by a community college, was assigned to provide library services to the inmates housed in the maximum security unit of a state penitentiary. Initially, a corrections officer was present at all times that the plaintiff was on duty in the library. Prison officials then changed the officer's schedule, leaving the plaintiff on duty in the library without an officer present. The plaintiff was subsequently kidnapped, held hostage, and sexually assaulted by an inmate library assistant. The plaintiff brought a § 1983 claim against the prison officials responsible for changing the schedule. In re-

jecting the assertion that a special relationship existed between the plaintiff and the defendants, the court held:

> In particular, without downplaying the dangerous conditions that undoubtedly existed in the penitentiary, we believe the consensual nature of the employment relationship between [the plaintiff] and defendants differentiates this case from those in which a "special relationship" has been found to exist.... By her employment with the college and assignment to the prison library ... she was free to come and go each day of her employment. Through this employment relationship she was not taken into state custody and held against her will.

*Liebson,* 73 F.3d at 276. *See also Walker v. Rowe,* 791 F.2d 507, 511 (7th Cir.) (no special relationship between state and prison guards), *cert. denied,* 479 U.S. 994, 107 S.Ct. 597, 93 L.Ed.2d 597 (1986).[13]

Numerous other courts that have addressed the issue since *DeShaney* and *Collins* have also refused to recognize a special relationship in circumstances other than incarceration or institutionalization. *See Wooten v. Campbell,* 49 F.3d 696, 700 (11th Cir.) (no special relationship between state and child where child was in mother's physical custody and child did not rely solely on state for his physical needs and safety), *cert. denied,* — U.S. —, 116 S.Ct. 379, 133 L.Ed.2d 302 (1995); *Walton v. Alexander,* 44 F.3d 1297, 1303 (5th Cir.1995) (no special relationship between state and student at state school for the deaf); *Wright v. Lovin,* 32 F.3d 538, 541 (11th Cir.1994) (consensual relationship of school to school children does not constitute a special relationship).

---

**13.** Henderson argues that the Eleventh Circuit's holding in *Cornelius v. Town of Highland Lake,* 880 F.2d 348, 354 (11th Cir.1989), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990), suggests that she had a special relationship with the Facility Defendants. In *Cornelius,* the plaintiff, employed as the town clerk, was required to work in the town hall, an area where inmates from a local prison worked as part of a community work program. The inmates abducted her and terrorized her. The Eleventh Circuit found that there was a genuine issue of fact as to whether a special relationship was created between the plaintiff and her municipal employer.

We differ with the Eleventh Circuit's analysis of the special relationship exception. We further note that the Eleventh Circuit has itself questioned whether the holding in *Cornelius* survives the United States Supreme Court's pronouncement in *Collins* that a voluntary employment relationship, standing alone, does not impose a constitutional duty on government employers to provide a reasonably safe work environment. *Wooten v. Campbell,* 49 F.3d 696, 700 n. 4 (11th Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 379, 133 L.Ed.2d 302 (1995); *Wright v. Lovin,* 32 F.3d 538, 541 n. 1 (11th Cir.1994).

We conclude that *Collins* mandates a strict and careful approach to the law in this area, and we thus agree with those cases limiting the special relationship exception to circumstances of severe limitations on liberty in the nature of incarceration or institutionalization. A consensual employment relationship ordinarily does not meet this standard. Henderson argues that the Facility Defendants deprived her of her liberty by prohibiting her from carrying a weapon and forcing her to go to work in light of the known danger. These actions did not constitute a restraint on her liberty similar to incarceration or institutionalization. The Facility Defendants did not force Henderson to rely on them for the provision of her basic needs, nor did they limit her freedom of action or liberty. Therefore, we conclude that Henderson, as a voluntary employee at the Facility, did not have a special relationship with the Facility Defendants.

### B.

We turn to an analysis of the danger creation exception [14] which requires us to determine whether the Facility Defendants' actions or inactions contributing to the danger that ultimately resulted in Sojka's attack upon Henderson, gave rise to a constitutional duty to protect her from that attack.

In analyzing the danger creation exception, we recognize that many state activities [15] have the potential for creating some danger. However, not every danger or vulnerability to danger created by the State gives rise to a corresponding constitutional duty to protect. *Freeman v. Ferguson,* 911 F.2d 52, 55 (8th Cir.1990). We recognize the different approaches taken by the federal courts in determining when the constitutional duty to protect arises in the context of the danger creation exception. At least the Ninth and Eleventh Circuits have adopted a broad application of the exception and found a constitutional duty to protect in situations in which the State's action or inaction provided the third party with an opportunity to cause the harm. *See Cornelius v. Town of Highland Lake,* 880 F.2d 348, 357–58 (11th Cir.1989), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990); *L.W. v. Grubbs,* 974 F.2d 119, 121 (9th Cir.1992), *cert. denied,* 508 U.S. 951, 113 S.Ct. 2442, 124 L.Ed.2d 660 (1993).[16]

In contrast, the Fourth, Fifth, Sixth, Seventh, Eighth, and Tenth Circuits have refused to impose a duty to protect unless the State has affirmatively placed a person in a situation of known danger that the person would not have faced in the absence of the State's involvement.[17] *See Uhlrig v. Harder,*

14. *DeShaney* is credited with developing the danger creation exception, although the portion of the case so credited gives slight shrift to such a test. *DeShaney,* 489 U.S. at 201, 109 S.Ct. at 1006. Previous to *DeShaney,* the Supreme Court analyzed the danger creation test in tort law causation terms of whether the defendant's conduct had a sufficiently close relationship to the claimed violation of the plaintiff's rights in order to conclude that the defendant "subjected" the plaintiff to the deprivation of federally protected rights. *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980).

15. In considering whether to apply the danger creation exception, the court of appeals focused on whether Henderson alleged affirmative acts by the Amended Complaint Defendants or merely omissions. *Henderson,* 910 P.2d at 53. The court cited several cases holding that claims based upon governmental inaction or failure to act to prevent injuries caused by other means are claims based upon simple negligence and thus are not cognizable under § 1983. *Id.* The court then concluded that Henderson's claims were not cognizable because the claims were "based upon assertions that various state officials failed

to take action rather than that they affirmatively acted in a manner that either created or enhanced the position of danger." *Id.* Inaction is typically actionable only in a special relationship context, *see DeShaney,* 489 U.S. at 199–200, 109 S.Ct. at 1005–06; however, we recognize that the distinction between an act and an omission can be semantic and we therefore decline to turn our analysis on that distinction.

16. Although the Ninth Circuit allowed the plaintiff's claim to proceed in *Grubbs,* the jury determined that the defendant had acted with gross negligence, but not recklessness or deliberate indifference. *L.W. v. Grubbs,* 92 F.3d 894, 895 (9th Cir.1996). The Ninth Circuit concluded that without a showing of deliberate indifference a plaintiff could not establish § 1983 liability against a state official for an injury to a prison employee caused by an inmate, and reversed the jury verdict in favor of the plaintiff. *Id.* at 900.

17. The Third Circuit, although never expressly adopting the danger creation exception, has indicated support for a narrow application of the exception. *See D.R. v. Middle Bucks Area Voca-*

64 F.3d 567, 576 (10th Cir.1995) (refusing to allow § 1983 claim under danger creation exception where defendants allegedly created danger by requiring decedent to work with dangerous mental patient), *cert. denied*, —— U.S. ——, 116 S.Ct. 924, 133 L.Ed.2d 853 (1996); *Pinder v. Johnson*, 54 F.3d 1169, 1175–76 (4th Cir.) (holding that police simply failed to provide adequate protection and did not create the danger where plaintiff's boyfriend committed affirmative act of harm), *cert. denied*, —— U.S. ——, 116 S.Ct. 530, 133 L.Ed.2d 436 (1995); *Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 201–02 (5th Cir.1994) (questioning whether the danger creation exception is constitutionally sound and holding that school officials did not create danger by failing to implement security measures sufficient to protect student), *cert. denied*, —— U.S. ——, 115 S.Ct. 1361, 131 L.Ed.2d 218 (1995); *Nobles v. Brown*, 985 F.2d 235, 238 (6th Cir.1992) (refusing to find danger creation exception where female prison guard was raped by inmate because it was the inmate and not the State which inflicted harm); *Gregory v. City of Rogers*, 974 F.2d 1006, 1011–12 (8th Cir.1992) (rejecting argument that police officer placed individuals in danger by arresting the driver of their vehicle and leaving them in the vehicle with the keys in the ignition while they were intoxicat-

ed), *cert. denied*, 507 U.S. 913, 113 S.Ct. 1265, 122 L.Ed.2d 661 (1993); *Losinski v. County of Trempealeau*, 946 F.2d 544, 550–51 (7th Cir.1991) (holding that deputy sheriff neither created danger nor subjected decedent involuntarily to existing danger by accompanying her to collect belongings from her home where decedent's husband fatally shot her).[18] These circuits require more than the creation of a dangerous environment in which harm occurs or the creation of an opportunity for a third party to cause the harm.

The context of the case before us, as well as our general analysis of the law on the subject, support adoption of the narrow construction of the danger creation exception. A prison is undeniably a dangerous environment. Each time a violent criminal is incarcerated in a prison, a danger is created. Each time a prison employee is required to make personal contact with an inmate, a danger is created. Yet, § 1983 was not created to impose liability upon prison officials for injuries to employees resulting from the officials' failure to provide enough guards, for their decision to allow direct contact between inmates and employees, or for installing mirrors which are then used as weapons by inmates. In order to give rise to a constitutional duty to protect, the state actors must

*tional Technical Sch.*, 972 F.2d 1364, 1373–76 (3d Cir.1992) (concluding that State did not create danger where school employees failed to investigate and prevent sexual abuse of female student by classmates), *cert. denied*, 506 U.S. 1079, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993). Both the Second and Eighth Circuits have allowed plaintiffs to plead § 1983 claims where police officers created a danger by condoning a third party's violent actions against the victim of the violence. *See Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir.1993) (holding that complaint which alleged that police told "skinheads" they would not interfere in assaults against flag burners stated claims on which relief could be granted under § 1983); *Freeman v. Ferguson*, 911 F.2d 52, 54 (8th Cir.1990) (allowing plaintiff to amend pleadings to attempt to satisfy danger creation exception where police chief directed officers not to interfere with murderer's threats and intimidating actions against decedent, thereby increasing the decedent's vulnerability to "the actions of [the murderer] and possibly ratifying or condoning such violent actions on his part"). We view the holdings in these cases as being consistent with a narrow application of the danger creation exception.

18. The Seventh Circuit, based on the principle that "plaintiffs may state claims for civil rights violations if they allege state action that creates, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to a danger tha[n] they otherwise would have been," *Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir.), *cert. denied*, 510 U.S. 947, 114 S.Ct. 389, 126 L.Ed.2d 337 (1993), has allowed a § 1983 claim to proceed against police officers who removed sober drivers and left behind drunk passengers with keys. *Id.* at 1127. Under those circumstances, the court was satisfied that "[b]y removing a safe driver from the road and not taking steps to prevent a dangerous driver from taking the wheel, the defendants arguably changed a safe situation into a dangerous one." *Id. But see Walker v. Rowe*, 791 F.2d 507, 509 (7th Cir.) (holding that prison officials were not liable under § 1983 for acts and omissions which arguably increased the danger to which guards were exposed because the prisoners and not the prison officials injured the guards), *cert. denied*, 479 U.S. 994, 107 S.Ct. 597, 93 L.Ed.2d 597 (1986).

do more than merely create an environment in which harm occurs. Rather, the state actors must abuse their governmental power by subjecting a person to harm that would not have occurred in the absence of the state actor's conduct.

Guided again by caution as mandated in *Collins,* we hold that the Facility Defendants' role in the creation of the danger that resulted in Henderson's harm did not give rise to a constitutional duty to protect. Henderson does not allege that the Facility Defendants caused her injuries. There is no allegation that the Facility Defendants intentionally provided Sojka with a weapon or encouraged the attack in any way.

Henderson does allege that the manner in which the Facility Defendants operated the Facility placed her in a dangerous situation or, at least, increased her vulnerability to danger. Henderson further alleges that the Facility Defendants affirmatively created the danger by ordering her to go to work.

 We conclude that Henderson's claim essentially is that the Facility Defendants failed to provide her with a safe work environment. We acknowledge that the Facility Defendants could have operated the Facility in a manner that lessened the risk of harm to Henderson. For example, it is possible that the Facility Defendants could have prevented the attack on Henderson by providing more guards, or placing bars between Henderson and the inmates. However, the Due Process Clause does not guarantee "a workplace that is free of unreasonable risks of harm." *Collins,* 503 U.S. at 129, 112 S.Ct. at 1070. Even if the Facility Defendants operated the Facility in an unsafe manner, this does not give rise to a constitutional duty to protect Henderson. Furthermore, the Facility Defendants cannot be said to have created a danger simply by expecting Henderson to go to work in a prison.

## C.

Having concluded that the Facility Defendants had no duty to Henderson to protect against the acts of Sojka, we need go no further in our analysis. However, we do not wish to leave the impression that in a case in which a duty was established, the state actor defendants would always be liable. Therefore, we proceed to discuss an additional step necessary to assert a cognizable § 1983 claim. Again, we make reference to general tort concepts and relate this prong of the analysis to culpability.

 Not all state action that occurs in a custodial setting or that creates a danger or a vulnerability to danger imposes a corresponding constitutional duty to protect. A plaintiff must also allege facts that show that the State acted, or declined to act, with the requisite degree of culpability in failing to protect the plaintiff.

The level of culpability required to state a § 1983 claim based on a failure to protect from injury inflicted by a third party is more than mere negligence. *See Daniels v. Williams,* 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986) ("[T]he Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property.") (alteration in original).

 The level of culpability necessary has been variously identified as conduct that would " 'shock the conscience' of federal judges," *Collins,* 503 U.S. at 126, 112 S.Ct. at 1069 (quoting *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209–10, 96 L.Ed. 183 (1952)), and as conduct that is "deliberately indifferent," *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). We conclude that the Facility Defendants' actions and omissions not only fail to "shock the conscience," but also cannot be characterized as deliberately indifferent.

The "shock the conscience" standard was initially articulated in *Rochin.* In that case, police officers took the defendant to a hospital and required a doctor to pump the defendant's stomach to recover two capsules of morphine. The morphine was then used as evidence against the defendant in a criminal trial in which the defendant was convicted of possessing a "preparation of morphine." *Rochin,* 342 U.S. at 166, 72 S.Ct. at 206–07. In overturning the conviction, the Supreme Court stated: "[W]e are compelled to conclude that the proceedings by which this

conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience." *Id.* at 172, 72 S.Ct. at 209. The Court's holding in *Rochin* suggests that the State's conduct may rise to the level of a substantive due process violation if it "shocks the conscience." This standard was repeated in *Collins,* where the Court held that the city's failure to train its employees or warn them about known risks of harm could not "properly be characterized as arbitrary, or conscience shocking in a constitutional sense." *Collins,* 503 U.S. at 128, 112 S.Ct. at 1070.

█ The "shock the conscience" standard requires that a plaintiff do more than show that a state actor "intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." *Uhlrig,* 64 F.3d at 574. In order to satisfy this standard, a plaintiff must demonstrate "a high level of outrageousness, because the Supreme Court has specifically admonished that a substantive due process violation requires more than an ordinary tort and that merely allowing unreasonable risks to persist in the workplace is not necessarily conscience shocking." *Id.*

█ The deliberate indifference standard is the required standard in a § 1983 claim to set forth a violation of the Eighth Amendment. *See Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) (deliberate indifference to prisoner's serious illness or injuries states cause of action under § 1983). In addition, several federal appellate courts have held that deliberate indifference is the appropriate standard of culpability to establish a due process violation under § 1983 where the State's duty arises as a result of the creation of the danger which harms the plaintiff. *See L.W. v. Grubbs,* 92 F.3d 894, 896 (9th Cir.1996) (plaintiff must show that state official participated in creating a dangerous condition and acted with deliberate indifference to the known or obvious danger in subjecting the plaintiff to it); *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1152–55 (3d Cir.) (holding that in a state created danger case even if there

was a constitutional violation, § 1983 liability will not attach unless the defendants acted with deliberate indifference), *cert. denied,* — U.S. ——, 116 S.Ct. 165, 133 L.Ed.2d 107 (1995); *Johnson,* 38 F.3d at 201 (deliberate indifference would be required in state created danger case).

█ Deliberate indifference contains an intent element that must rise at least to the level of recklessness. *Uhlrig,* 64 F.3d at 573. Reckless intent "involves an unreasonable disregard of a known great risk." *Medina v. City & County of Denver,* 960 F.2d 1493, 1496 (10th Cir.1992). *See also Woodward v. City of Worland,* 977 F.2d 1392, 1399 n. 11 (10th Cir.1992) ("[R]ecklessness is generally regarded as satisfying the scienter requirement of § 1983 because it requires proof that the defendant focused upon the risk of unconstitutional conduct and deliberately assumed or acquiesced in such risk."), *cert. denied,* 509 U.S. 923, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993).

In this case, Henderson alleges that the Facility Defendants failed to protect her from Sojka's attack, even though they had knowledge that an escape attempt might occur. We do not believe that these allegations support a conclusion that the Facility Defendants disregarded a known great risk. In order to rise to the level of conduct that manifests reckless disregard for a person's *constitutional* rights, a state actor must manifest "obdurate disregard or complete indifference to risk, for example 'when the actor does not care whether the other person lives or dies, despite knowing that there is a significant risk of death' or grievous bodily injury." *Medina,* 960 F.2d at 1496 (quoting *Archie v. City of Racine,* 847 F.2d 1211, 1219 (7th Cir.1988), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989)).

Further, the level of culpability of the Facility Defendants must again be analyzed against the backdrop of causation. The Facility Defendants are not alleged to have harmed Henderson or to have caused Henderson's injuries; they are alleged to have failed to intervene to prevent the injuries from occurring. When the state actor's involvement in the chain of causation is more

direct, the foreseeability of the injury and therefore the knowledge, or recklessness of the actor is easier to analyze. For instance, if a state actor engages in an unnecessary high speed automobile chase that results in an injury to a bystander, the causative element of that state actor's conduct is clear and the question then becomes whether the defendant consciously disregarded serious, immediate, and proximate harm to a specifically definable group. *See Medina*, 960 F.2d at 1496–97.

Here, the Facility Defendants' conduct was a number of steps in the causative chain removed from Henderson's injuries and, therefore, the foreseeability of the injury to Henderson was more remote. Although the Facility Defendants may have permitted an unreasonably unsafe work environment to exist, we do not read the amended complaint to satisfy the level of foreseeability and reckless disregard of a known great risk required under § 1983.

The attack that Henderson suffered was tragic. We are not insensitive to her plight. However, we are not charged with determining whether she was wrongfully injured; rather, we are charged with determining whether the Facility Defendants engaged in conduct that violated Henderson's constitutional rights. We conclude that they did not.

### III.

Henderson's complaint fails to allege the existence of a special relationship between Henderson and the Facility Defendants. Furthermore, the Facility Defendants' role in the circumstances leading to Henderson's injury was not, even in the light most favorable to Henderson, sufficiently causative to give rise to a corresponding duty to protect. Lastly, the Facility Defendants' conduct was neither "conscience shocking," nor completely and deliberately indifferent. Therefore, on the facts of this case, the general rule that a state actor is not liable for acts of violence committed by third parties applies. The Facility Defendants did not deprive Henderson of a constitutional right and are thus not

liable under § 1983.[19] For these reasons, we affirm the court of appeals decision.

LOHR, J., dissents, and KIRSHBAUM and SCOTT, JJ., join in the dissent.

SCOTT, J., dissents, and LOHR and KIRSHBAUM, JJ., join in the dissent.

Justice LOHR dissenting:

The majority holds that Mary L. Henderson failed to allege facts in her amended complaint sufficient to state a claim that the defendants created the dangerous situation that resulted in a vicious and prolonged attack upon her by William Sojka, an inmate at the state correctional facility at which Henderson was employed. As a result, the majority concludes that the district court properly dismissed Henderson's claims under 42 U.S.C. § 1983 (1994). I agree with Judge Taubman's dissent to the court of appeals' affirmance of the dismissal. *See Henderson v. Romer*, 910 P.2d 48, 55 (Colo. App.1995) (Taubman, J., concurring in part and dissenting in part). I would hold that the allegations in the amended complaint, viewed in the light most favorable to Henderson, amply support a reasonable inference that defendants Wager and Price (defendants), who were supervisory officials at the state correctional facility, deprived her of her Fourteenth Amendment substantive due process rights by intentionally or recklessly creating the danger resulting in the attack upon Henderson or rendering her more vulnerable to that attack. I therefore respectfully dissent and would remand the case to the court of appeals with instructions to vacate the district court's order of dismissal.

### I.

For the purpose of assessing whether a trial court properly granted a motion to dismiss, "the allegations of the complaint must be viewed in the light most favorable to the plaintiff." *Dunlap v. Colorado Springs Cablevision*, 829 P.2d 1286, 1291 (Colo.1992).

---

**19.** The Facility Defendants argue that they are entitled to assert the defense of qualified immunity. Because we conclude that the Facility Defen-

dants have not violated Henderson's constitutional rights, we need not consider the qualified immunity defense.

Dismissal is not warranted " 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Id.* (quoting *Davidson v. Dill,* 180 Colo. 123, 131–32, 503 P.2d 157, 162 (1972)). A complaint may not be dismissed if its allegations support relief on any possible theory. *Dunlap,* 829 P.2d at 1290.

I agree substantially with the analytical framework set forth in the majority opinion. As a general rule, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 197, 109 S.Ct. 998, 1004, 103 L.Ed.2d 249 (1989). Accordingly, § 1983 provides no remedy for such an injury. *See id.*[1] As the majority opinion notes, this rule has two important exceptions. These exceptions permit a § 1983 action when (1) a "special relationship" exists between the state and the injured plaintiff, or (2) the state intentionally or recklessly creates the danger resulting in the harm to the plaintiff or renders the plaintiff more vulnerable to the harm. *Uhlrig v. Harder,* 64 F.3d 567, 571–72, 572 n. 7 (10th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 924, 133 L.Ed.2d 853 (1996). In addition, the injured party must show that the state action " 'shock[s] the conscience.' " *Id.* at 571 (quoting *Collins v. City of Harker Heights,* 503 U.S. 115, 126, 112 S.Ct. 1061, 1069, 117 L.Ed.2d 261 (1992)).

In *DeShaney,* the United States Supreme Court first alluded to the existence of the second exception, suggesting that a state breaches a constitutional duty to protect an individual from harm when it plays a part in the creation of the danger to the individual or makes the individual more vulnerable to the danger. *See* 489 U.S. at 201, 109 S.Ct. at 1006. The majority opinion correctly states that this exception is not satisfied when a state's failure to conform to a standard of care would constitute mere negligence under state tort law. *See Collins,* 503 U.S. at 128, 112 S.Ct. at 1070. Instead, a supervisory employee whose conduct is imputable to the state must possess a culpable mental state permitting the inference that the supervisor either intentionally harmed the plaintiff or that the supervisor intentionally or recklessly placed the plaintiff in a situation presenting an unreasonable risk of harm. *Uhlrig,* 64 F.3d at 573. A supervisor acts "recklessly" when the supervisor "recognizes the unreasonable risk and actually intends to expose the plaintiff to such risks without regard to the consequences to the plaintiff." *Id.* at 574 n. 8. Such action has sometimes been characterized as "deliberate indifference." *L.W. v. Grubbs,* 974 F.2d 119, 123 (9th Cir.1992).

I am compelled to disagree, however, with the majority opinion's application of this analytical framework to the facts of this case as set forth in Henderson's amended complaint. The complaint alleges that on February 28, 1992, Henderson was attacked and tortured by an inmate at the Arkansas Valley Correctional Facility while Henderson was working alone in her assigned office performing her job duties of distributing aspirin and other items to the inmates. Inmates, including Sojka, were allowed access to the office during a ten minute period each morning pursuant to official policy and procedure. During this period on February 28, Sojka attacked Henderson and held her hostage with the broken shank of a mirror. Over a span of five and one-half hours, Sojka beat Henderson, tortured her, cut her neck, face, and hands, and shocked her repeatedly with an electrical cord in an attempt to electrocute her.

According to the complaint, Sojka's attack was part of a broader conspiracy among the prisoners to effect an escape from the facility. The complaint further alleges that Henderson and other employees had notified Wager, a facility supervisor, of evidence of "the impending attack and hostage taking

---

**1.** 42 U.S.C. § 1983 provides, in relevant part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immu-
nities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
42 U.S.C. § 1983 (1994).

threat" at least a week prior to the attack on Henderson. Henderson "requested that [Wager] take action to prevent the attack and hostage taking." Pursuant to official policy, Henderson forwarded a confirmatory memorandum "outlining evidence of the inmates' conspiracy" to Wager and Price, facility superintendent, "several days prior to the incident." The complaint goes on to allege that despite these entreaties, Wager and Price took no action. Four days before the attack, when Henderson inquired of Wager what preventive measures he had taken in response to her report of the conspiracy, Wager replied to the effect that "he couldn't be 'shuffling people around' and 'we don't want to rock the boat.'" In addition, the complaint alleges that the defendants knew Sojka was unreasonably dangerous, based on his psychological rating, to be incarcerated in the Arkansas Valley facility and the housing unit where Henderson worked. The complaint alleges that Wager received information the day before the attack that an inmate had warned another employee not to come to work the next day. This information, taken together with the information previously provided by Henderson, strongly suggested that the escape attempt would take place the very next day. The complaint makes the further allegation that the defendants, notwithstanding their awareness of an impending escape attempt and the danger to Henderson in particular, required Henderson to work on the day of the attack without having provided protection or taken any other steps to forestall the attack visited upon her.

Because of the defendants' inaction in refusing to respond to the general threat of the impending escape attempt and the specific danger to Henderson, and their action in requiring her to work without having implemented any safety measures, the amended complaint alleges that the defendants:

(f) intentionally placed Mary [Henderson] in a situation of danger created by them with reckless indifference, in unguarded proximity with an inmate unreasonably dangerous for the facility.

(g) ... intentionally or recklessly failed to take any action in response to multiple warnings of the impending action by inmates to protect Mary.

(h) ... intentionally placed Mary in a situation of known danger of their creation with deliberate indifference to that danger, after receiving warning of a pending incident.

The majority opinion nevertheless concludes that Henderson's amended complaint is deficient. In particular, the majority opinion cites *Collins* for the determination that Henderson's allegations show only that the defendants created an unsafe work environment. Maj. op. at 1160. In *Collins,* Larry Michael Collins, an employee of the city of Harker Heights, Texas, died of asphyxia after entering a manhole to unplug a sewer line. 503 U.S. at 117, 112 S.Ct. at 1064. His widow brought a § 1983 action against the city, alleging that the city created an unreasonable risk of harm to Collins by "following a custom and policy of not training its employees about the dangers of working in sewer lines and manholes, not providing safety equipment at jobsites, and not providing safety warnings." *Id.* Although the widow alleged that the city's conduct was intentional, the Supreme Court held that her complaint did not set forth a cognizable constitutional violation because its factual allegations essentially set forth a claim for mere negligence. *See id.* at 128, 112 S.Ct. at 1070. The Court noted that the widow "does not even allege that [Collins'] supervisor instructed him to go into the sewer when the supervisor knew or should have known that there was a significant risk that he would be injured. Instead, she makes the more general allegation that the city deprived [Collins] of life and liberty by failing to provide a reasonably safe work environment." *Id.* at 125–26, 112 S.Ct. at 1069.

The Court's decision in *Collins* is thus distinguishable on its facts. In the present case, Henderson does not simply allege that the defendants knew of the dangers inherent in working at a correctional facility and yet did nothing. She alleges, rather, that both Price and Wager knew of the specific danger to her due to the impending escape attempt and yet consciously chose to ignore that threat. She also alleges that Price and Wa-

ger were aware of Sojka's unusually dangerous propensities and that official policy and procedure "allowed inmates to visit [Henderson's] office between approximately 6:20 and 6:30 a.m. each morning to obtain items such as aspirin or other personal items." Moreover, her allegations support the reasonable inference that the defendants affirmatively took steps to put Henderson in a position of danger and increase her vulnerability. Even though the defendants had information that a mass escape attempt was imminent and that Henderson would be particularly vulnerable, they required her to work at a duty assignment where she was alone and in direct contact with prisoners without having implemented any measures to promote her safety.

Because Henderson's complaint alleges that Price and Wager knew of Sojka's violent nature but did nothing to assure Henderson's safety, this case is similar to *Grubbs*. *See* 974 F.2d at 120–21. In *Grubbs*, the plaintiff worked as a registered nurse at a state medium security custodial institution for young male offenders. *Id.* at 120. The defendants, who were the plaintiff's supervisors, selected an inmate committed for violent sex offenses to work with the plaintiff alone in the prison's medical clinic. *Id.* As a result of this dangerous situation, the inmate assaulted, battered, kidnapped, and raped the plaintiff. *Id.* As in the present case, the defendants in *Grubbs* asserted that their conduct was not actionable under § 1983 because it amounted to mere negligence. *Id.* In reversing the district court's dismissal of the complaint for failure to state a claim, the Ninth Circuit Court of Appeals rejected this argument, noting that the defendants, by assigning the inmate to work with the plaintiff, created an opportunity for him to assault her "that would not otherwise have existed." *Id.* at 121.

As in *Grubbs*, the defendants in the present case had specific knowledge of the threat Sojka posed if left alone with someone in a vulnerable position. Moreover, Henderson had repeatedly warned the defendants that the requirement that she work alone with minimal physical protection posed an unreasonable risk to her unless preventive measures were taken—especially in light of evidence of an impending escape attempt. According to the complaint, however, the defendants consciously disregarded this threat and required Henderson to work without having implemented any precautionary measures whatsoever. Although they did not actually require Henderson to work with Sojka, they created the situation that enabled him to have access to her while she worked alone in her office. In addition, the allegations of the complaint indicate that the defendants were aware of the exact day that the risk to particularly vulnerable employees, such as Henderson, would substantially increase.[2] Despite this knowledge, the defendants remained consciously indifferent to the consequences of the grave risk to Henderson because alleviating that risk would be inconvenient. In my view, such conscious indifference evinces a degree of culpability absent in ordinary negligence cases.

Thus, it is reasonably inferable from Henderson's allegations that the defendants recklessly created an opportunity for Sojka to assault Henderson because the enhanced danger on the day in question was obvious.

---

2. Although the complaint does not allege that the defendants could foresee that the escape attempt would necessarily result in an attack upon Henderson specifically, such an allegation is not required to support a § 1983 claim that a state actor was deliberately indifferent to a known, great risk to a specific individual. In *Medina v. City and County of Denver*, 960 F.2d 1493, 1496 (10th Cir.1992), the Tenth Circuit Court of Appeals stated that "[i]t is not … necessary that the defendant know the specific identity of each person within [a specifically definable group] in order for his conduct to be deemed directed toward the individuals within the group." Thus, Henderson sufficiently alleges that the defen-

dants could foresee that their reckless conduct would put her at substantial risk by alleging that she was peculiarly vulnerable to the consequences of the impending escape attempt, that the defendants knew of Sojka's unusually dangerous proclivities, and that the defendants had information of the precise day on which the attempt would occur. *See id.* (defendant may be liable for reckless conduct under § 1983 if plaintiff is member of specifically definable group, defendant's conduct puts members of group at substantial risk of serious, immediate, and proximate harm, risk was obvious or known, and defendant acted recklessly in conscious disregard of risk).

*See Cornelius v. Town of Highland Lake,* 880 F.2d 348, 354 (11th Cir.1989) (" 'If the state *puts* a man in a position of danger and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.' ") (quoting *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982) (alteration in original)); *Medina,* 960 F.2d at 1496 ("[G]iven the fact that reckless intent involves an unreasonable disregard of a known great risk rather than intent to cause a particularized harm, the defendant's reckless conduct may be considered to be directed toward the plaintiff if the plaintiff is closely and immediately tied to the perceived substantial risk."). Under these circumstances, the defendants' alleged conduct affirmatively increased Henderson's vulnerability to a specific, known danger. *See DeShaney,* 489 U.S. at 201, 109 S.Ct. at 1006 (state not liable under § 1983 for beatings of child by father because, "[w]hile the State may have been aware of the dangers that [the child] faced . . . it played no part in their creation, nor did it do anything to render [the child] any more vulnerable to them."); *Cornelius,* 880 F.2d at 357 (§ 1983 claim stated when defendants created potentially dangerous situation and placed the plaintiff in a distinct position of danger); *Jarvis v. Deyoe,* 892 P.2d 398, 400 (Colo.App.1994) (§ 1983 claim cognizable, even in noncustodial setting, if the state affirmatively created or enhanced the risk of harm).

In addition to alleging intentional or reckless creation of danger or increased vulnerability to danger resulting in injury, a plaintiff must allege facts that "shock the conscience" in order to state a § 1983 claim against the state for acts committed by third persons. *See Uhlrig,* 64 F.3d at 574. In *Uhlrig,* the Tenth Circuit Court of Appeals first stated that even if a defendant's conduct "intentionally or recklessly caused injury to the plaintiff," "the plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." 64 F.3d at 574. The

court did not precisely define the type of conduct that shocks the conscience, but stated that the parameters of the requirement "must necessarily evolve over time from judgments as to the constitutionality of specific government conduct." *Id.* The court found that the defendants' conduct in that case did not shock the conscience because their actions "resemble[d] those typical of legitimate governmental decisions in times of scarcity—that is, the making of difficult policy choices to reconcile various competing social, political and economic forces." *Id.* at 576. Recently, the Tenth Circuit has more specifically elucidated the test for determining when intentional or reckless conduct may be considered to be "outrageous." In *Williams v. Denver,* 99 F.3d 1009, 1016 (10th Cir.1996), the court stated that the motivation for the defendant's conduct is a factor to consider in determining whether such conduct is conscience shocking:

> In assessing whether the official conduct at issue is arbitrary or conscience-shocking in a constitutional sense, however, the risk of harm must be weighed against the justification for creating that risk. Conduct that is justified and therefore not arbitrary in one circumstance may be so unjustified as to be unconstitutional under different circumstances.

*Id.*[3] To determine an official's "justification" for creating a risk, the court stated that an "official's state of mind is significant," and conduct "which is motivated by an *improper* purpose is unquestionably more likely to shock the conscience than the same actions done for legitimate reasons." *Id.* at 1017 n. 8.

If Henderson had merely alleged that the defendants failed to act in the face of the general prospect of a future escape attempt, it would be difficult to conclude that their conduct was conscience-shocking. However, the amended complaint also alleges that the defendants knew that Sojka had especially dangerous propensities and that an escape attempt involving hostage taking was immi-

---

**3.** In *Williams* the Tenth Circuit Court of Appeals reversed a summary judgment determination in a § 1983 action that a police officer had not acted unconstitutionally in circumstances where the officer caused an accident resulting in death by speeding and running a red light while responding to a non-emergency call. 99 F.3d at 1017.

nent. The complaint alleges further that Wager's reaction to Henderson's inquiry as to what action he had taken in response to the impending escape attempt was "to the effect that he couldn't be 'shuffling people around' and ... 'we don't want to rock the boat.'" From this latter allegation it can reasonably be inferred that the defendants' motivation for requiring Henderson to report to work without having taken any steps in response to her concerns was improper. Specifically, a reasonable inference can be drawn from this allegation that the defendants failed to take action because it would be inconvenient, not because of important considerations of prison administration. In light of this improper motivation, and the actual harm of a generally foreseeable nature that resulted, the defendants' conduct clearly rises to a level of outrageousness that shocks the conscience. *Cf. Williams,* 99 F.3d at 1017 n. 8 (police officer's conduct in responding to non-emergency call conscience-shocking because he was "speeding for its own sake" and his action posed great risk of harm). Although the defendants' action in requiring Henderson to work without having taken any action to promote her safety could have been consistent with her substantive due process rights in the absence of knowledge of an impending escape attempt, the threat of hostage taking, and the particular dangerous propensities of inmate Sojka, the circumstances alleged in the amended complaint adequately state a claim for violation of those rights.

## II.

I am not unmindful of the majority opinion's cautionary note that "'[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.'" Maj. op. at 1156 (quoting *Collins,* 503 U.S. at 125, 112 S.Ct. at 1068). Although this admonition is well-taken, this is simply not a case where we are being asked to "break new ground." As Judge Taubman noted in his concurring and dissenting opinion in the court of appeals, "at least four federal circuit courts of appeal have recognized the danger creation exception to *DeShaney* and allowed a § 1983 claim to go forward." *Henderson,* 910 P.2d at 57

(Taubman, J., concurring in part and dissenting in part). Although the majority acknowledges that a motion to dismiss requires the reviewing court to view all allegations of a complaint in favor of the plaintiff, in my view the majority opinion fails to apply that standard to the facts of this case. When the allegations in Mary Henderson's complaint are construed in her favor, the conclusion is inescapable that the defendants' culpable action or inaction unreasonably increased the risk of Sojka's brutal attack and thereby created the danger to which she was unnecessarily exposed. The circumstances alleged are truly conscience shocking. I would hold that the amended complaint adequately states a claim under § 1983 upon which relief can be granted. I therefore dissent to the majority's affirmance of the court of appeals judgment upholding the district court's dismissal of that claim.

KIRSHBAUM and SCOTT, JJ., join in this dissent.

Justice SCOTT, dissenting:

I join in Justice Lohr's dissent; however, I write separately to make clear my concern that by placing such an onerous burden on the plaintiff's crafting of her complaint, the majority opinion, in effect, may be improperly read to establish a heightened pleading requirement for claims made pursuant to 42 U.S.C. § 1983 in contravention of our rules of civil procedure. The majority's holding, as a consequence, should not be read to reflect any hostility in this court to § 1983 claims; otherwise, plaintiffs whose pleadings are not sufficiently informed by evidence more usually obtained through discovery, or at later stages of litigation, will no longer have access to our courtrooms and, therefore, need not seek entry to obtain remedies for the deprivation of fundamental rights.

I agree with the majority that a plaintiff must allege facts showing that the State "acted, or declined to act, with the requisite degree of culpability in failing to protect the plaintiff." Maj. op. at 1160. Furthermore, I agree that allegations of recklessness or deliberate indifference must be pled to meet the appropriate standard of culpability to

establish a due process violation under § 1983 where the State's duty arises as a result of the creation of the danger which harms the plaintiff. Maj. op. at 1161. Nonetheless, unlike the majority, I conclude that Henderson's allegations, when read in the light most favorable to her, are sufficient to support an inference that the Facility Defendants acted in disregard of a known great risk. *See* maj. op. at 1162.

Under the Colorado Rules of Civil Procedure, which subscribe to notice pleading, all that is required is "a short and plain statement of the claim showing that the pleader is entitled to relief." C.R.C.P. 8(a)(2); *Dorman v. Petrol Aspen, Inc.,* 914 P.2d 909, 911 (Colo. 1996). The only instance in which complaints must be particular is when fraud or mistake are alleged. C.R.C.P. 9(b). Intent, as well as malice and knowledge, may be averred generally. *Id.* As set forth in Justice Lohr's dissent, Henderson has met this requirement.

The United States Supreme Court has recently held similarly. Writing for a unanimous Court, Chief Justice Rehnquist opined that a federal court may not apply a "heightened pleading standard" in civil rights cases alleging municipal liability under § 1983. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). The Court considered the Federal Rules of Civil Procedure 8(a)(2) and 9(b) and concluded that neither rule imposes a particularity requirement regarding pleadings except when fraud or mistake are averred. *Id.* at 168, 113 S.Ct. at 1163. The Court further stated that in the absence of a specificity requirement in pleading constitutional violations, federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later. *Id.* at 168–69, 113 S.Ct. at 1163. In my view, the same should apply here, instead of an approach that would clear court dockets, prematurely dismissing the meritorious claims along with the unmeritorious.

In my opinion, it is not possible to file a complaint replete with detailed allegations and facts because, as contemplated by our rules of civil procedure, the period in which a great deal of investigating and learning takes place—discovery—has not yet occurred. As such, it is inappropriate to require plaintiffs to demonstrate at the complaint stage what may only become clear after discovery. More importantly, our rules do not require such specificity in pleadings.

I disagree with the majority's conclusion that Henderson's allegations are not sufficient to overcome the Facility Defendants' motion to dismiss or that they will not permit an inference that the defendant disregarded a known great risk. *See* maj. op. at 1162. To the contrary, I agree with Justice Lohr's dissent that the allegations support the reasonable inference that the defendants affirmatively took steps to place Henderson in a position of danger and thereby increased her vulnerability. Lohr, J., dissenting, at 1164–65.

Accordingly, because I believe that the majority's reading of Mary Henderson's complaint is onerous and obliterates remedies that would vindicate substantive rights otherwise guaranteed under § 1983, I respectfully dissent.

I am authorized to say that Justice LOHR and Justice KIRSHBAUM join in this dissent.